**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

ASHLEY MOODY and AUTUMN
TERRELL, on behalf of themselves and on
behalf of all others similarly situated,

                 Case No.: 16-60364-WPD

              Plaintiffs,

    v.

ASCENDA USA INC. d/b/a 24-7
INTOUCH, and VERIFIED
CREDENTIALS, INC.,

             Defendants.

_____/

**MOTION TO DISMISS PLAINTIFFS' THIRD CLASS CLAIM FOR RELIEF AGAINST
<u>VERIFIED CREDENTIALS, INC. AND MEMORANDUM OF LAW</u>**

Defendant, Verified Credentials, Inc. ("Verified"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, moves for an order dismissing with prejudice the Third Claim for Relief ("Count III") in Plaintiffs' First Amended Class Action Complaint ("Amended Complaint").

## INTRODUCTION

In Count III of the Amended Complaint, Plaintiff Ashley Moody ("Plaintiff") contends that Verified, a consumer reporting agency ("CRA"), prepared a background report on her for Ascenda USA, Inc. ("Ascenda")[1] which allegedly contained "inaccurate and adverse information." Count III is brought under Section 1681k(a) of the Fair Credit Reporting Act ("FCRA"). The Court should dismiss Count III of the Amended Complaint for multiple reasons.

First, Count III should be dismissed because, despite amending her Complaint, Plaintiff still bases her theory of liability on a fundamental misreading of Section 1681k(a). Section 1681k(a) does *not* provide a remedy for an "inaccurate" background report. Indeed, Section 1681k(a) contains *no* reference whatsoever to "accuracy" and does not, as a matter of law, require CRAs to ensure the factual accuracy of background reports. Although the Amended Complaint now uses the correct Section 1681k(a) terminology ("complete and up to date"), the allegations of the Amended Complaint make it clear that Plaintiff's entire theory of liability still is that Verified reported information about her that was "inaccurate" and "false" when it allegedly matched her to criminal records that did not belong to her. As multiple courts have recognized, such accuracy-based allegations do not state a claim for relief under Section 1681k(a).

---

[1] The Amended Complaint also asserts claims against Ascenda, brought on behalf of Moody and Autumn Terrell. Plaintiff Terrell does not assert a claim against Verified.

By its plain language, Section 1681k(a) requires CRAs to do one of two things -- either provide contemporaneous notice to consumers when they report public record information about them (Section 1681k(a)(1)) *or* maintain strict procedures designed to insure that the information *actually being reported* is "complete and up to date" (Section 1681k(a)(2)). In other words, if notice is not provided, Section 1681k(a) requires Verified to maintain procedures to ensure that its reports reflect the current status *of the records reported.* In contrast, Section 1681e(b) of the FCRA (15 U.S.C. § 1681e(b)) regulates inaccurate data in consumer reports, and is the *exclusive* recourse for a consumer alleging harm on the basis of an allegedly inaccurate background report. Unlike Section 1681e(b), the language of Section 1681k(a)(2) does not require CRAs to ensure the factual accuracy of each report and it does not require CRAs to report every conceivable piece of available information. Rather, the Section merely requires that the record *actually reported* reflect the current status of *that* record. Plaintiff's allegations and Count III claim continue to attempt to conflate these two distinct concepts of completeness and accuracy.

Plaintiff's Count III class claim fails for another reason. As defined, Plaintiff's Count III class includes only those individuals for whom Verified allegedly did not provide notice under Section 1681k(a)(1). But to state a *viable* claim under Section 1681k(a), Plaintiff and any putative class member must plead and establish noncompliance with *both* Subsections (1) and (2) of Section 1681k(a). For this separate reason, Plaintiff's Count III class claim fails.

Finally, Plaintiff's allegations in Count III that Verified "willfully" violated Section 1681k(a) must also be dismissed for separate reasons: Plaintiff does not adequately plead "willful" conduct and because her theory of liability is based on her incorrect interpretation of Section 1681k(a). As a matter of law, Plaintiff cannot show that Verified's alleged conduct was

"objectively unreasonable" -- the required and demanding standard for a "willful" violation of the FCRA. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2009).

For these reasons, the Court should dismiss Count III in its entirety and with prejudice.

## RELEVANT FACTUAL ALLEGATIONS[2]

Verified is a CRA that provides background reports to third parties, including Ascenda. (Am. Compl. ¶¶ 4, 6, 21-22, 43.)  Plaintiff Moody was an employee of Ascenda USA.  (*Id.* ¶ 37.) In December, 2014, Ascenda requested a background report on Plaintiff Moody from Verified. (*Id.* ¶ 43.)

According to the Amended Complaint, Verified's background report on Plaintiff Moody "contained inaccurate and adverse information."  (Am. Compl. ¶ 65.)  As alleged, the report "stated that she had been convicted of petit theft and drug possession," but the "convictions listed on [Plaintiff's] original consumer report belonged to someone else."  (*Id.* ¶ 45.)  Plaintiff alleges that Verified did not notify Plaintiff that it had provided Ascenda with a consumer report about her.  (*Id.* ¶ 44.)

## ARGUMENT

I.   **PLAINTIFF'S SECTION 1681K(A) CLAIM SHOULD BE DISMISSED IN ITS ENTIRETY BECAUSE PLAINTIFF RELIES ON A MISREADING OF THE STATUTE.**

A.   **Applicable Standard of Review**

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter" to show that the claim is "plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  To be considered facially plausible, the plaintiff must plead "sufficient factual content that allows the court to draw the reasonable

---

[2] The statement of facts contained herein is based on Plaintiffs' Amended Complaint, the allegations of which are assumed to be true solely for purposes of this Motion.

inference that the defendant is liable for the misconduct alleged." *Id.* This "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, a complaint needs "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.*

A district court determining whether a complaint meets this standard "must accept as true all of the allegations contained in a complaint but need not accept legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A complaint that offers mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.*

### B. Count III of the Amended Complaint Should Be Dismissed Because Section 1681k(a) Does Not Require a CRA to Ensure Accuracy.

Section 1681k(a) applies to a CRA that "furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment[.]" 15 U.S.C. § 1681k(a). Section 1681k(a)(2) requires that such CRAs "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." 15 U.S.C. § 1681k(a)(2).[3] Under Section 1681k(a)(2), any information reported by the CRA is *per se* up to date "if the current public record status of the item at the time of the report is reported." *Id.*

---

[3] Section 1681k(a) provides two separate and independent compliance options for CRAs who report public record information. To state a claim for a violation of Section 1681k(a), Plaintiff must sufficiently allege a violation of *both* subsection (1) and subsection (2) of Section 1681k(a). *See infra*, pp. 12-14. Although Plaintiff's class definition wrongly assumes that an alleged violation of subsection (1) is enough to state a Section 1681k(a) claim, the Amended Complaint appears to allege that, with respect to Plaintiff Moody, Verified did not comply with Section 1681k(a)(1). Thus, Verified's motion is not based on compliance with Section 1681k(a)(1).

In other words, CRAs must maintain the requisite "strict procedures" to ensure that the information *actually reported* is "complete and up to date." The statute does not require procedures designed to ensure that the "report" itself is "complete" or "accurate;" rather, it requires procedures designed to ensure that the *public record information being reported* is "complete." The phrase "complete and up to date," therefore, requires CRAs to ensure that a specific item reported is complete and up to date in the sense that it contains the final disposition of that item. Importantly, Section 1681k(a)(2) does *not* require a CRA to ensure the accuracy of information regarding the individual about whom the report relates.

Here, Count III of the Amended Complaint is based on a misreading of Section 1681k(a)(2). Although Plaintiff makes conclusory references to the Section's "complete and up to date" language (*see* Am. Compl. ¶¶ 36, 45, 47, 48), the *specific* allegations of the Amended Complaint demonstrate that Count III is based on Plaintiff's allegations that Verified prepared an "inaccurate" and "erroneous" report about her by allegedly reporting records as belonging to her that actually belonged to someone else (*see id.* ¶¶ 45, 47, 48, 52, 65). In particular, while Plaintiff makes the conclusory statement that her report was "both incomplete and up to date," she proceeds to allege that this is the case because the report allegedly "stat[ed] that she had been convicted of [crimes] when, in fact, [she] has no criminal convictions whatsoever." (*Id.* ¶ 52.) Plaintiff also alleges in conclusory fashion that Verified prepared other reports "containing inaccuracies and adverse information about employees or applicants for employment." (*Id.* ¶ 65.) Critically, however, *nowhere* in the Amended Complaint is it alleged that the records actually reported about Plaintiff or any putative class member failed to reflect the correct final disposition of *those reported records*, *i.e.* what is actually required by Section 1681k(a)(2).

In sum, Count III continues to confuse Section 1681k(a) with Section 1681e(b) -- the Section of the FCRA expressly directed at the "accuracy" of background reports.  Plaintiff's interpretation of Section 1681k(a) would rewrite that Section to impose a heightened "accuracy" requirement.  For the reasons below, the Court should reject Plaintiff's expansive interpretation of Section 1681k(a).

1.      **As Recognized By Recent Case Law, the Unambiguous Statutory Text And Overall Statutory Scheme, Section 1681k(a)(2) Does Not Require a CRA To Ensure Factual Accuracy.**

To determine the meaning of Section 1681k(a)(2), the Court must start with the plain and unambiguous language of the statute.  *See Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) ("It is well established that when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms.").  Further, under the canon of statutory construction of *noscitur a sociis*, it must resolve the meaning of statutory phrases by referring to the surrounding text.  *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1246-47 (11th Cir. 2008).

In full, Section 1681k(a)(2) provides that CRAs must:

> Maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date.  For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

15 U.S.C. § 1681k(a)(2).

Section 1681k(a)(2) is clear and unambiguous in what it does and does not require. Importantly, the statute makes *no* mention of "accuracy."  Quite simply, by its plain language, Section 1681k(a)(2) does *not* require a CRA to ensure the accuracy of its report.  Rather, Section 1681k(a)(2) only requires CRAs to maintain strict procedures designed to insure that public

record information *actually being reported* and that is likely to have an adverse effect on a consumer's employability is "complete and up to date."

Plaintiff wrongly attempts to conflate the FCRA's two distinct concepts of completeness and accuracy.  Here, Plaintiff's basis for claiming harm is based on Verified's preparation of an allegedly "inaccurate" and "false" report that matched her to records belonging to another individual.  (Am. Compl. ¶¶ 45, 52, 65.)  This allegation very literally relates to *accuracy* -- and not to "completeness" under Section 1681k(a)(2), which is concerned with ensuring that a CRA does not report only some public record information (*e.g.*, an arrest or an indictment) but then fail to report the rest of that information (*e.g.*, a dismissal or an acquittal).

With no basis in the statutory text, Plaintiff nonetheless alleges that "information cannot be considered 'complete' or 'up to date' under the FCRA" unless it is both accurate and pertains to the subject of the report.  (Am. Compl. ¶ 47.)  Plaintiff also confuses the language of Section 1681e(b) to support her Section 1681k(a) claim by alleging that Verified furnished Ascenda with reports "containing *inaccurate and adverse* information about employees or applicants for employment, demonstrating Defendant Verified Credentials' failure to ensure the *accuracy* of these reports." (*Id.* ¶ 65) (emphasis added).  In several other paragraphs, the Amended Complaint also wrongly assumes or flat-out states that Section 1681k(a) requires a CRA to ensure the "accuracy" of its reports and that  "complete and up to date" *actually* means "accurate. " (*Id.* ¶¶ 45, 47, 48, 52, 65.)  But only the phrase "complete and up to date" is in the actual statutory text.  Plaintiff would implant the word "accuracy" where it simply does not exist.

Importantly, adopting an interpretation of Section 1681k(a)(2) that imposes a heightened accuracy requirement or conflates accuracy-based allegations with "completeness" would render other portions of the FCRA superfluous.  The Court should interpret Section 1681k(a)(2) in a

way that makes it consistent with other sections of the FCRA and in a manner that gives effect to all of its provisions. *See King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]e must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions."); *Gilbert v. Alta Health & Life Ins. Co.*, 276 F.3d 1292, 1296 (11th Cir. 2001) (recognizing rule of statutory construction that courts must look to the "the provisions of a whole law" and the overall statutory scheme).

Contrary to Plaintiff's position, it is clear from other sections of the FCRA that "complete" does not mean "accurate." Section 1681e(b) is the FCRA's "accuracy" section and specifically requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow *reasonable procedures to assure maximum possible accuracy* of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b) (emphasis added). Importantly, the FCRA does *not* impose strict liability for claims arising from background reports. *See e.g. Levine v. World Fin. Network Nat. Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009). In short, Plaintiff's attempt to graft an "accuracy" requirement onto Section 1681k(a)(2)'s "strict procedures" mandate would result in a complete rewrite of the FCRA and an entirely new strict liability standard for the preparation of consumer reports.

Recent case law has adopted Verified's plain meaning interpretation of the statute. In *Doe v. Sterling Infosystems, Inc.*, No. 15-cv-4770 (C.D. Cal. Dec. 21, 2015) (ECF No. 30) (attached as Exhibit 1), like here, the plaintiff brought a Section 1681k(a) claim based on a CRA's inclusion of allegedly erroneous information in his background report. *Id.* at 1-2. Like here, the plaintiff's Complaint wrongly assumed that: (a) an allegation of inaccuracy was sufficient to state a claim under Section 1681k(a)(2); and (b) Section 1681k(a)(2) was a more stringent version of Section 1681e(b). *Id.* at 6-7

In its opinion, the *Doe* court flatly rejected an "accuracy" component to Section 1681k(a)(2). Ex. 1 at 6-7. First, the court distinguished Section 1681e(b) from Section 1681k(a)(2), recognizing that "[w]hile [the latter] requires 'complete' and 'up-to-date' information, it says nothing of accuracy," which is addressed in Section 1681e(b). *Id.* at 6. The court then analyzed the statutory text. Based on the language of Section 1681k(a)(2), the court concluded:

> [A]s commonly used, "incomplete" means lacking all necessary parts or missing necessary components. Based on this definition, just because a report contains gratuitous and factually false information, thereby making it "inaccurate," does not mean it is missing pertinent information to render it "incomplete."

*Id.* at 6.

The court also considered what is required for a report to be "complete and up to date." Ex. 1 at 6-7. Again focusing on the statutory text, the court found that the "pertinent information" to be included in a "complete" report is that information spelled out in the second sentence of Section 1681k(a)(2): "the current public record status," which requires a CRA to report "any expunged charges, released tax liens, or dismissed judgments . . . ." *Id.* at 6-7. Thus, the court correctly rejected the argument that Section 1681k(a)(2) includes an "accuracy" component. *Id.*

The same result was reached just weeks ago in *Jones v. Sterling Infosystems, Inc.*, No. 14-3076 (S.D.N.Y. Mar. 30, 2016) (ECF No. 67) (attached as Exhibit 2). In *Jones*, the plaintiff, like here, alleged that the CRA erroneously matched criminal records to him that belonged to other individuals. *Id.* at 1-2. From this alleged inaccuracy, the plaintiff sought to represent a nationwide class under Section 1681k(a) and based on the misguided theory that "inaccurate" is the same as "incomplete."

As in *Doe*, the *Jones* court rejected Plaintiff's "expansive interpretation" of Section 1681k(a)(2). *Id.* at 4-9. In a detailed analysis, the court reviewed both the overall structure of the FCRA and the plain meaning of Section 1681k(a)(2). *Id.* First, the court noted that plaintiff's position only made sense "if the purpose of § 1681k(a)(2) were to prevent criminal records from being attributed to the wrong person." *Id.* at 5. The court, however, recognized that the "problem with Plaintiff's argument is that there is an entirely different section of the statute . . . that is designed for that purpose" -- Section 1681e(b). *Id.* The court concluded Section 1681k(a)(2)'s "strict" procedures requirement could not apply to accuracy-based claims, as "[h]aving already mandated reasonable procedures to ensure accuracy, it does not make sense that Congress would have imbued in the word 'complete' the obligation Plaintiff advances." *Id.* *Jones* proceeded to analyze the "plain meaning" of Section 1681k(a)(2), concluding that it was concerned with the "obligation of the CRA to report current (as opposed to outdated) records" -- but *not* to ensure the "accuracy" of those records. *Id.* at 7.

*Doe* and *Jones* are consistent with the statutory text of Section 1681k(a)(2). Plaintiff's intended result -- strict procedures for "accuracy" when the FCRA already provides for "reasonable procedures" -- is inconsistent with the statutory language. As in *Doe* and *Jones*, this court should apply the plain language of the statute and dismiss Count III of the Amended Complaint.

        **2.**      **Consistent With The Statute's Unambiguous Text, The Legislative History Confirms That Section 1681k(a) Is Concerned With Ensuring That the Final Disposition of A Reported Item Is Included On a Report.**

The language of Section 1681k(a)(2) is not ambiguous, and the Court may reject Plaintiff's "accuracy"-focused claim based on the plain language alone. Verified's plain-meaning interpretation of Section 1681k(a), however, additionally is supported by the legislative

history of the FCRA.  *See Jones*, at 7-9 (concluding that legislative history made clear that the

purpose of Section 1681k(a)(2) was "to ensure that reporting agencies maintain strict procedures

'to verify the current status of such public record items' when reporting adverse public record

information," and not to ensure accuracy) (citation omitted).

The FCRA was first introduced in Congress in 1969 to address concerns about the third-

party reporting of public record information.  Specifically, Congress was concerned that CRAs

would report arrests, judgments, liens, and bankruptcies without reporting the dismissal of suits,

reversal of judgments, or settlements outside of court.  117 Cong. Rec. S1164 (daily ed. Jan. 31,

1969) (statement of Sen. William Proxmire) (attached as Exhibit 3).  In a statement to the

Committee on Bankruptcy and Currency on S. 823 on May 20, 1969, Alan F. Westin, Professor

of Public Law and Government at Columbia University, stated:

> [the credit reporting system] displays serious flaws in obtaining and recording
> information about arrests that lead to dismissed charges or even expunged police
> records because of unjustified arrest; or about lawsuits settled out of court; or
> suits that represented only pressure in a bargaining situation; or convictions
> reversed on appeal in a higher court.

*See* Fair Credit Reporting:  Hearings before the Subcomm. on Financial Institutions of the Senate

Comm. on Banking and Currency, 91st Cong. 93 (1969) (attached as Exhibit 4).

Other remarks about the "completeness" of public record information in the

Congressional record make clear that Congress' concerns related to CRA's reporting only

incomplete steps in the adjudication process, and *not* the reporting of *inaccurate* information.

*See, e.g.*, S. Rep. No. 91-517, at 4 (1969) (noting that public record information is not always

kept up to date because it is costly or because the correct information is not available) (attached

as Exhibit 5); 117 Cong. Rec. E5072 (daily ed. May 25, 1971) (remarks of Representative

Sullivan following the enactment of the FCRA notes errors due to incomplete information being

reported, including that dismissal of charges or suits are often not reported, leaving arrests and filing of lawsuits on the record) (attached as Exhibit 6).

Thus, as evidenced by the Congressional record, Congress designed the FCRA to address the reporting of public record information that did not include potentially favorable dispositions of arrests, lawsuits, and other similar findings.  Congress did *not* consider public record information "incomplete" due to a CRA *inaccurately* reporting information.  By requiring CRAs to report "complete" information, Congress simply wanted CRAs to report the full disposition of each item of public record information they chose to report.  Such a reading is consistent with the text as written.[4]

Thus, the statutory text, recent case law, and the legislative history all support Verified's interpretation of Section 1681k(a)(2).  On this basis alone, the Court should dismiss Count III of the Amended Complaint.

## II.    PLAINTIFF'S COUNT III CLASS CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFF'S CLASS INCLUDES MEMBERS WHO FAIL TO SUFFICIENTLY ALLEGE A VIOLATION OF SECTION 1681K(A).

When Section 1681k(a) applies, CRAs have two separate and independent compliance options.  CRAs may *either*: (1) send the notice identified in subsection (1); "*or*" (2) maintain "strict procedures" designed to ensure that, whenever it reports adverse public record information, the matters are "complete and up to date," *i.e.*, the final disposition of the item is reported.  *Id.* (emphasis added).  *Dalton v. Capital Assoc. Indus., Inc.*, 257 F.3d 409, 417 (4th Cir.

---

[4] Federal Trade Commission (FTC) guidance also supports this plain meaning interpretation of Section 1681k(a)(2).  In recent publications, the FTC has recognized that Section 1681k(a)(2)'s strict procedures requirement applies only to items actually reported and that, "[f]or example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report.  Similarly, if the CRA reports a conviction, it must report a reversal that has occurred on appeal."  40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report With Summary of Interpretations (July 2011), at 81-82 (attached as Exhibit 7).

2001) (recognizing that a CRA is obligated to do "one of two things" under Section 1681k(a));

*Henderson v. InfoMart, Inc.*, No. 14-cv-1609, 2014 U.S. Dist. LEXIS 185947 at **16-17 (N.D.

Ga. Aug. 15, 2014), report and recomm. adopted, Dkt. No. 61 (N.D. Ga. Sept. 2, 2014) (holding

that, under § 1681k(a), plaintiff must show violation of both subsection (1) and (2) of the statute;

*Jones*, Ex. 2 at 3 ("section 1681k(a) requires the CRA to do *one* of two things") (emphasis

added).

   To meet threshold pleading requirements, Plaintiff must allege a violation of each

element of the statute. *Henderson*, 2014 U.S. Dist. LEXIS 185947, at **16-17. As defined,

however, Plaintiff's "1681k Notice Class" quite literally misstates what is required by Section

1681k(a) by only referring to the "notice" provision in Section 1681k(a)(1). (*See* Am. Compl. ¶

11.) In doing so, Plaintiff's purported class entirely excises Section 1681k(a)'s option for CRAs

to forego the Section 1681k(a)(1) notice in favor of the maintenance of Section 1681k(a)(2)'s

"strict procedures" option.

   As defined, the "Section 1681k Notice Class" includes those Ascenda employees and

applicants who were:

> the subject of a Verified Credentials consumer report . . . that was
> furnished for an employment purpose . . . that contained at least
> one public record of a criminal conviction or arrest, civil lien,
> bankruptcy or civil judgment, and [ ] to whom Verified Credentials
> *did not place in the United States mail postage pre-paid, on the
> day it furnished the report, a written notice that it was furnishing
> the subject report and containing the name of the person that was
> to receive the report*.

(Am. Compl. ¶ 11, emphasis added.) As a matter of law, Plaintiff cannot maintain the defined

class. To state a Section 1681k(a) claim, Plaintiff and the putative class must plead *both* that: (1)

Verified failed to provide them with contemporaneous notice that public record information was

being reported; *and* (2) Verified failed to maintain the requisite "strict procedures designed to

insure" that the public record information being reported was "complete and up to date." *Dalton*, 257 F.3d at 417; *Henderson*, 2014 U.S. Dist. LEXIS 185947, at **16-17. Plaintiff's class only alleges a violation of one part of Section 1681k(a). Thus, the Count III class claim should be dismissed.

### III.    PLAINTIFF'S SECTION 1681K(A) CLAIM REGARDING "WILLFULNESS" SHOULD BE DISMISSED BECAUSE PLAINTIFF FAILS TO PLAUSIBLY ALLEGE THAT VERIFIED "WILLFULLY" VIOLATED THE STATUTE.

In the Amended Complaint, Plaintiff alleges that Verified "willfully" violated Section 1681k(a) of the FCRA. Under Section 1681n of the FCRA, the statutory damages of $100 to $1,000 per alleged violation, punitive damages and costs and attorneys' fees are only available for a "willful" violation. 15 U.S.C. § 1681n. If the alleged violation is not "willful," Plaintiff must then prove actual damages for herself and every Section 1681k(a) putative class member.

Plaintiff's allegations that Verified "willfully" violated Section 1681k(a) fail as a matter of law. First, Plaintiff's "willfulness" allegations are insufficient to state a claim under *Iqbal*. Second, Plaintiff's willfulness allegations fail as a matter of law to meet the Supreme Court's standard for a "willful" violation of the FCRA. *Safeco*, 551 U.S. at 69. Accordingly, Plaintiff's request for statutory and punitive damages must be dismissed.

### A.    Plaintiff's Allegations That Verified "Willfully" Violated Section 1681k(a) Fall Short of Meeting Threshold Pleading Requirements.

Plaintiff wholly fails to satisfy *Iqbal* with respect to her allegations of a "willful" violation of Section 1681k(a). To state a willful violation of the FCRA, Plaintiff must plead *facts* showing Verified acted in a "willful" manner, which requires more than just a characterization of conduct as willful and far more than the mere "formulaic recitation of the elements of a cause of action" found in Plaintiff's Amended Complaint. *Iqbal*, 556 U.S. at 678.

Indeed, the Amended Complaint falls short of meeting the basic pleading requirements of Rule 8 and *Iqbal*.

In the Amended Complaint, Plaintiff merely inserts the words "willful" and "knowingly" to her allegations of noncompliance by Verified. (*See* Am. Compl. ¶¶ 8, 36, 93.) Those adverbs, however, are not facts. At most, Plaintiff may point to: (1) her incorrect belief that Section 1681k(a) is concerned with the "accuracy" of background reports (despite containing no reference to "accuracy"); (2) her addition of language that her report also was "incomplete," despite the allegations confirming her claim is accuracy-based and (3) her allegations that CRAs "would know of, or could easily discover" Plaintiff's personal, unsupported interpretation of Section 1681k(a) (despite Plaintiff pointing to no case law or other authority supporting her interpretation that Section 1681k(a) allows for accuracy-based claims) (*see* Am. Compl. ¶ 93). Plaintiff's conclusory, speculative allegations simply do not give rise to a plausible inference that Verified acted "willfully." *See, e.g.*, *Davila v. Delta Air Lines*, 326 F.3d 1183, 1185 (11th Cir. 2003) ("conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal [for failure to state a claim.]") For this reason alone, Plaintiff's allegations of "willful" violations of the statute should be dismissed.

### B. Plaintiff's Allegations Fail To Satisfy The Applicable Standard For A "Willful" Violation of the FCRA.

Even if Plaintiff's allegations of "willful" conduct could pass muster under *Iqbal*, Plaintiff's "willfulness" allegations still fail as a matter of law under *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2009). In *Safeco*, the Supreme Court held that, as a matter of law, there is not a "willful" violation of the FCRA unless the plaintiff establishes that a defendant's attempts to comply with the FCRA were "objectively unreasonable." *Id.* This demanding standard is not met "unless the action is not only a violation [of the FCRA] under a reasonable reading of the

statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.*

Two primary factors assist in determining whether a defendant acted in an "objectively unreasonable" manner. The first factor is the clarity of the statutory text at issue. According to *Safeco*, if a defendant's reading of the FCRA "has a foundation in the statutory text," that fact favors a finding that the company did *not* act "objectively unreasonable." 551 U.S. at 69-70. The second factor is the availability of guidance on a particular statutory requirement. *Id.* at 70. Where there is a "dearth of guidance" on a particular subject, it is less likely that a company's technical violation of part of the FCRA is "objectively unreasonable." *Id.* Thus, in the absence of controlling legal authority or guidance from the Federal Trade Commission, it is unlikely that a company's conduct is egregious enough to qualify as "objectively unreasonable" to warrant the potential for statutory and punitive damages. *Id.*

Here, as a matter of law, Plaintiff cannot show that any technical violation of Section 1681k(a)(2) was "objectively unreasonable." By Plaintiff's own allegations, her Section 1681k(a) claim is rooted in the misguided belief that a report must be "accurate" to be "complete and up to date." Verified's alleged failure to comply with Plaintiff's self-serving (and incorrect) interpretation of the FCRA cannot possibly be a "willful" violation of the statute, particularly where several courts have already rejected her strained interpretation. Indeed, as explained above, Plaintiff cannot point to *any* legal authority at the time Plaintiff's report was prepared that would have required Verified to ensure accuracy in order to comply with Section 1681k(a). *See Williams v. First Advantage LNS Screening Solutions, Inc.*, No. 13-cv-222, 2015 WL 9692872, at *13 (N.D. Fla. Oct. 14, 2015) (dismissing Section 1681k(a)(2) willfulness allegations based on the "uncertainty in what 'complete and up to date' means" and the "scant guidance" on

interpreting the statute).  Rather, as explained above, multiple courts have adopted Verified's position. *See supra*, pp. 8-10.  As such, it cannot be said that any violation based on a theory of liability repeatedly rejected by Courts constitutes a willful violation.

Finally, to the extent Plaintiff argues it is premature to determine the question of willfulness, courts within the Eleventh Circuit have recognized that this question is ripe at the motion to dismiss stage.  In *Henderson*, the court held that where the issue of willfulness turns on whether the law is clear at the time of the alleged violation, the issue may be decided on a motion to dismiss.  *Henderson*, No. 14-cv-1609, 2014 U.S. Dist. LEXIS 185947 *46 n. 19 (*citing Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 376 (3d Cir. 2012)); *see also Schoebel v. Am. Integrity Ins. Co.,* No. 8:15-cv-380, 2015 WL 3407895, at **7-9 (M.D. Fla. May 27, 2015) (finding insufficient allegations of willfulness in FCRA case at the motion to dismiss stage).  Thus, although in other contexts, "the question of willfulness is an issue of fact for the jury . . . those cases usually involve questions of fact as to what the defendant knew at the time of the alleged violation.  That is not an issue in [a FCRA] case."  *Goode v. LexisNexis Risk & Info. Analytics Group, Inc.*, 848 F. Supp. 2d 532, 543 n.10 (E.D. Pa. 2012).

Accordingly, Plaintiff's allegations that Verified "willfully" violated Section 1681k(a) should be dismissed for these additional reasons.

## **CONCLUSION**

For the reasons set forth above, Verified respectfully requests the Court to enter an Order dismissing with prejudice Count III of the Amended Complaint.

DATED: April 25, 2016                    SEYFARTH SHAW LLP

By: */s/Suzanne A. Singer*              
Suzanne A. Singer
**RUMBERGER KIRK & CALDWELL**
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, FL 33130
Telephone: (305) 358-5577
Facsimile: (305) 371-7580

Pamela Q. Devata*
Kyle Petersen*
John W. Drury*
**SEYFARTH SHAW LLP**
131 S. Dearborn Street, Suite 2400
Chicago, IL 60603
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

*Attorneys for Defendant*
*Verified Credentials, Inc.*

*admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2016, the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

 /s/ Suzanne A. Singer

*One of the Attorneys for Defendant*
*Verified Credentials, Inc.*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | **CV 15-04770 RGK (AJWx)** | Date | December 21, 2015 |
|---|---|---|---|
| Title | ***John Doe v. Sterling Infosystems, Inc., et al.*** | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams, Not Present | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:** **(IN CHAMBERS) Defendant's Motion to Dismiss (DE 21)**

## I.     <u>INTRODUCTION</u>

On June 24, 2015, John Doe[1] ("Plaintiff") filed a class action complaint against Sterling Infosystems, Inc. ("Defendant"), alleging violations of the Fair Credit Reporting Act ("FCRA") and its California analog, the Investigative Consumer Reporting Agencies Act ("ICRAA").

On September 18, 2015, Plaintiff filed a First Amended Complaint ("FAC"). On October 5, Defendant filed a Motion to Dismiss the FAC. The parties then stipulated to the filing of a Second Amended Complaint ("SAC"), which this Court granted. On October 26, 2015, Plaintiff filed the SAC.

Presently before the Court is Defendant's Motion to Dismiss portions of Plaintiff's SAC. For the reasons set forth below, the Court **GRANTS** Defendant's Motion.

## II.     <u>FACTUAL BACKGROUND</u>

The instant case involves a credit reporting agency's misrepresentation of Plaintiff's criminal history, which has allegedly tarnished Plaintiff's reputation and harmed his employment prospects.

On April 16, 2010, Plaintiff was convicted of a misdemeanor for carrying a concealed "dirk or dagger" in violation of Cal. Pen. Code § 12020(a)(4)[2]. Four years later, after successfully completing probation, Plaintiff was hired as a temporary worker at a staffing agency. In connection with Plaintiff's hiring, the staffing agency procured a consumer report on January 31, 2014.

The consumer report, which is at the heart of this dispute, disclosed that Plaintiff had been

---

[1]Plaintiff is suing under a pseudonym to protect his anonymity and prevent risk of harm to his employment prospects.

[2]Repealed January 1, 2012. Renamed and renumbered without substantive change to Cal. Penal Code § 21310.

convicted of a felony and listed his charged offense as: "Dangerous weapons, manufacture, sale, possession; carrying explosive or concealed dirk and dagger." (SAC ¶ 4, ECF No. 20.)

Plaintiff alleges that the consumer report was erroneous in two ways. First, the report stated that Plaintiff had been convicted of a felony when he had only been found guilty of a misdemeanor. Second, the report miscommunicated the nature of the charged offense by including crimes associated with Cal. Penal Code § 12020(a)(1)-(3). Plaintiff had only been convicted of Cal. Penal Code § 12020(a)(4), carrying a concealed dirk or dagger.

Even though Plaintiff was later put on a different job assignment by the staffing agency, he claims that he suffered damage to his reputation and lost job placement opportunities because of his employer's mistaken belief about the nature of his criminal history.

On February 9, 2015, Plaintiff complied with California requirements to expunge his record and remove the guilty plea. *See* Cal. Penal Code § 1203.4. Plaintiff's expungement attorneys sent three requests to Defendant, asking for copies of his full file pursuant to both the FCRA and ICRAA. According to the SAC, Defendant never responded to these requests, and, to date, Plaintiff has still not received a copy of his full file.

Plaintiff claims that Defendant's failure to respond to his requests for disclosure and its failure to maintain accurate and complete records violates several provisions of the FCRA and ICRAA. Plaintiff further alleges that Defendant's conduct was intentional, and he seeks punitive and statutory damages for willful violations. 15 U.S.C. § 1681n. Alternatively, Plaintiff seeks actual damages for negligent violations. 15 U.S.C. § 1681o.

## III.   **JUDICIAL STANDARD**

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible if the plaintiff alleges enough facts to draw a reasonable inference that the defendant is liable. *Id*. A plaintiff need not provide detailed factual allegations but must provide more than mere legal conclusions. *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. When ruling on a Rule 12(b)(6) motion, the court must accept the allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

## IV.   **DISCUSSION**

### A.   **ICRAA Is Unconstitutionally Vague As Applied to Defendant's Conduct**

Defendant argues that the ICRAA is unconstitutionally vague as applied to the present case, and, therefore, all claims based on the ICRAA must be dismissed. Because the Court agrees, it need not address any other arguments pertaining to the ICRAA claims.

In 1975, California enacted two distinct statutes, modeled after the FCRA, to regulate the credit reporting industry: the Consumer Credit Reporting Agencies Act ("CCRAA") and the Investigative Credit Reporting Agencies Act ("ICRAA"). *Ortiz v. Lyon Mgmt. Grp., Inc.*, 69 Cal. Rptr. 3d 66, 70 (Ct. App. 2007).

CCRAA applies to "consumer credit reports," defined as communications bearing on a consumer's creditworthiness when that information is used to establish eligibility for: personal credit,

housing, employment, or other specified purposes. Cal. Civ. Code § 1785.3(c). ICRAA oversees "investigative consumer reports," defined as "consumer report[s] in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through any means." Cal. Civ. Code § 1786.2(c). Simply put, CCRAA regulates consumer reports containing information about a consumer's *creditworthiness* while ICRAA governs consumer reports containing information about a consumer's *character*.

Each Act "imposes different obligations on persons compiling or requesting . . . reports, depending on whether the information therein pertains to creditworthiness [CCRAA] or character [ICRAA]." *Ortiz*, 69 Cal. Rptr. 3d at 71. While the statutes were intended to coexist harmoniously, since their enactment they have come into tension. Much of the friction stems from the difficulty of classifying information in a report as either bearing on creditworthiness, governed by CCRAA, or character, regulated by ICRAA.

As originally enacted, the statutes provided two bases to distinguish consumer reports, thereby allowing for much easier classification. Reports were to be differentiated based on the information contained therein as well as the means by which that information was obtained. *Ortiz*, 69 Cal. Rptr. 3d at 73. For instance, any report containing information about a consumer's *character* obtained through *personal interviews* fell within the ambit of the ICRAA. *Id.* On the other hand, any reports containing information about a consumer's *creditworthiness,* except reports obtained through *personal interviews*, were subject to the CCRAA. *Id.*

In 1998, the California legislature amended the ICRAA to eliminate the "personal interviews" requirement, expanding its scope to include all consumer reports "obtained through any means." Cal. Civ. Code § 1786.2(c). "After the amendment, one could still look at the means by which information was obtained to determine whether the report was excluded from the CCRAA. The CCRAA still excludes character information obtained through personal interviews. But one could no longer look at the means by which information was obtained to determine whether it is subject to the ICRAA. One may look only at the type of information—whether it relates to the consumer's character." *Ortiz*, 69 Cal. Rptr. 3d at 73.

Put differently, the problem arises when a report is *not* obtained through personal interviews because the ICRAA now governs such reports and the CCRAA does not expressly exclude such reports, meaning that a consumer reporting agency cannot ascertain which statute applies merely based on the manner in which information is obtained. Instead, the 1998 amendment forced consumer reporting agencies to determine which statute applies based solely on the type of information in a given report. Unfortunately, as the ensuing cases highlight, information often times relates to both creditworthiness and character, leaving consumer reporting agencies uncertain as to whether the ICRAA or the CCRAA applies to a given report.

The first California Court of Appeal to address the confusion created by the 1998 amendment held that the ICRAA is unconstitutionally vague. *Ortiz*, 69 Cal. Rptr. 3d at 75. The *Ortiz* decision involved a tenant screening report that contained "unlawful detainer" information. 69 Cal. Rptr. 3d at 68. The court explained that unlawful detainer information bears on both creditworthiness and character. *Id.* at 74. For instance, in a situation where the unlawful detainer action is based on untimely payments, it suggests a lack of *creditworthiness*. *Id.* If, however, the unlawful detainer action is premised on waste or nuisance, it can indicate elements of a tenant's *character*, such as obstinacy or carelessness. *Id.* In light of such confusion, the court held, "We are left with no rational basis to determine whether unlawful detainer information constitutes creditworthiness information subject to the CCRAA or character information subject to the ICRAA." *Id.* at 75. Ultimately, the court declared the ICRAA unconstitutionally vague.

In a companion case, decided on the same day as *Ortiz*, the California Court of Appeal reinforced its holding. *Trujillo v. First Am. Registry, Inc.*, 68 Cal. Rptr. 3d 732 (2007). Much like in *Ortiz*, at the heart of the dispute in *Trujillo* was a tenant screening report containing unlawful detainer information. *Id.* at 740. The court held, "[T]he ICRAA is unconstitutionally vague because persons of reasonable intelligence cannot determine whether unlawful detainer information is character information subject to the ICRAA or creditworthiness information subject to the CCRAA. *Id.*

Two federal district courts have since applied the holding in *Ortiz*. *See Moran v. Screening Pros, LLC*, No. 2:12-CV-05808, 2012 WL 10655744 (C.D. Cal. Sept. 28, 2012); *Roe v. LexisNexis Risk Sols., Inc.*, No. CV-12-6284, 2013 U.S. Dist. LEXIS 88936, (C.D. Cal. Mar. 19, 2013).

In *Moran*, the report at issue was another tenant screening report containing information about the plaintiff's criminal history, eviction history, and credit history. *Moran*, 2012 WL 10655744 at *1. The court explained that information about criminal history bears on both creditworthiness and character, meaning that "the information impermissibly subjected the report to both the ICRAA and the CCRAA" without a "rational basis to decide [whether the report] should be governed by one statute versus the other." *Id.* at *7.

In *Roe*, the disputed report was an employment screening report containing criminal background information. *Roe*, 2013 U.S. Dist. LEXIS 88936 at *2. The Court first recognized, as had its predecessor in *Moran*, that criminal history information bears on both creditworthiness and character. *Id.* at *16. As such, the court reasoned, criminal information in the employment screening report is subject to both ICRAA and CCRAA without any way to distinguish which statute should apply. *Id*. at *17.

The weight of authority dictates that the employment screening report at issue, which contains Plaintiff's criminal history, relates to both creditworthiness and character. Because the information straddles both character and creditworthiness, Defendant is unable to draw a principled distinction as to whether ICRAA or CCRAA applies in the current situation. Accordingly, the ICRAA is unconstitutionally vague as applied to Defendant's conduct. *Ortiz*, 69 Cal. Rptr. 3d at 70 ("[I]n judging the constitutionality of a statute we must determine not whether it is vague in the abstract but, rather, whether it is vague as applied to this [defendant's] conduct in light of the specific facts of this particular case.").

Plaintiff invokes a recent California appellate decision that parted ways with Ortiz. Connor v. First Student, Inc., 191 Cal. Rptr. 3d 404 (Ct. App. 2015). In Connor, the report at issue was an employment report that contained criminal records, sex offender status, and employment history. Id. at 410. The Connor court fundamentally disagreed with the assumption that ICRAA and CCRAA were mutually exclusive and explained that nothing in the statutory language prevents both statutes from concurrently governing the same report. Id. at 412 ("The *Ortiz* court's statement . . . that a consumer report cannot be subject to both acts simply is not supported by the language of the acts as now amended."). In other words, "An agency that furnishes a report containing both creditworthiness information and character information, and the person who procures or causes that report to be made, can comply with each act without violating the other." Id. at 413. Proceeding with that assumption, the court concluded that the ICRAA was not unconstitutionally vague.

This Court cannot rely on the *Connor* opinion because the California Supreme Court has recently granted review, thereby superseding the appellate decision. "Under California Rules of Court, a superceded opinion is not considered published, and an unpublished opinion cannot be cited or relied on by other courts." *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1126 n.8 (9th Cir. 2005). Accordingly, this Court is not bound by the *Connor* court's analysis of California law. This leaves the Court with only *Ortiz*, which, as discussed above, compels a holding that the ICRAA is

unconstitutional as applied in this case.[3] The Court, therefore, dismisses all ICRAA claims.

## B. The FCRA Statutory Provisions At Issue

Having dismissed the ICRAA claims, the Court now turns to Plaintiff's claims premised on FCRA violations. Before addressing Defendant's arguments for dismissal, the Court provides a brief overview of the relevant statutory provisions at issue.

### 1. *15 U.S.C. § 1681g(a): Disclosure Requirement*

Section 1681g(a) requires every consumer reporting agency to clearly and accurately disclose to a consumer, upon request, "[a]ll information in the consumer's file at the time of the request," subject to certain exceptions. 15 U.S.C. § 1681g(a). Plaintiff claims that Defendant violated this provision by failing to respond to his three requests for consumer files.

### 2. *15 U.S.C. § 1681e(b): Obligation to Ensure Accurate Information*

Section 1681e(b) provides, "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

Plaintiff claims that Defendant violated this provision because the employment screening report at issue inaccurately displayed his misdemeanor as a "felony" and his charged crime as "Dangerous weapons, manufacture, sale, possession; carrying explosive or concealed dirk and dagger" instead of the actual charge of "concealed dirk or dagger."

### 3. *15 U.S.C. § 1681k(a)(2): Obligation to Ensure Complete Information*

Section 1681k(a)(2) mandates that a consumer reporting agency which furnishes a report for employment must "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." 15 U.S.C. § 1681k(a)(2).

Plaintiff claims that Defendant violated this provision because the employment screening report at issue incompletely displayed his misdemeanor as a "felony" and his charged crime as "Dangerous weapons, manufacture, sale, possession; carrying explosive or concealed dirk and dagger" instead of the actual charge of "concealed dirk or dagger."

## C. Failure to State A Claim For Violation of § 1681k(a)(2)

15 U.S.C. § 1681k(a)(2) provides:

(a) In general

---

[3] Plaintiff urges this Court to adopt the holding in *Connor* because the California Supreme Court's decision to grant review of *Connor* signals its disapproval of *Ortiz*, and, therefore, constitutes "convincing evidence" that the California Supreme Court will overrule *Ortiz*. *See California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1099 (9th Cir. 2003) ("[Federal courts] must defer to the California Court of Appeal's interpretation . . . unless there is convincing evidence that the California Supreme Court would decide the matter differently."). The Court declines the invitation because Plaintiff has not proffered "convincing evidence" that the California Supreme Court will adopt the *Connor* holding over the *Ortiz* holding.

> A consumer reporting agency which furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment shall . . .
>
> (2) maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date. For purposes of this paragraph, items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported.

Defendant argues that Plaintiff conflates "completeness" with "accuracy." While § 1681k(a)(2) requires "complete" and "up-to-date" information, it says nothing of accuracy; rather, the requirement that information be "accurate" is found in an entirely different provision, § 1681e(b). According to Defendant, the consumer report at issue here may be inaccurate because it misrepresents Plaintiff's charged crime, but is it not incomplete.[4] If anything, Defendant argues, the report is over-inclusive as it contains additional criminal offenses beyond the actual crime with which Plaintiff was charged.

Neither party disputes that misreporting a criminal offense on a consumer report runs afoul of the "accuracy" requirement in § 1681e(b). The only dispute before the Court is whether misreporting a criminal offense also renders a report "incomplete" in violation of § 1681k(a)(2). The Court is unable to locate any judicial opinions that have addressed this precise issue. Before the Court, then, is an issue of statutory interpretation. The starting point in construing any statute is to look to the plain language and determine whether it has an unambiguous meaning. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 177 (2004) ("The inquiry begins with the statutory text, and ends there as the text is unambiguous."). When a statute does not define a term, the court must give the word its ordinary and natural meaning. *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1707 (2012).

Here, Congress did not define the phrase "incomplete" in the definition section of the FCRA. 15 U.S.C. § 1681a. Therefore, the Court construes the word in its ordinary sense; as commonly used, "incomplete" means lacking all necessary parts or missing necessary components. Based on this definition, just because a report contains gratuitous and factually false information, thereby making it "inaccurate," does not mean it is missing pertinent information to render it "incomplete." The instant action serves as an apt illustration. Here, the consumer report at issue contains excessive information but does not omit any material facts about the Plaintiff's criminal history. Therefore, while the report can be reasonably characterized as "inaccurate" (insofar as it contains false information), it cannot be described as "incomplete" (as it is not missing any information).

The statutory context further reinforces the ordinary meaning of "incomplete." As the second sentence of § 1681k(a)(2) illustrates, the focus of this provision is on ensuring that consumer reports are not lacking any necessary information. The second sentence explains that a consumer report will be considered complete, and therefore in conformity with the statute, if it reflects the current public record

---

[4]Defendant does not admit liability, it merely argues that *even if* the consumer report can be characterized as "inaccurate," such a conclusion does not also render the report "incomplete." (Def.'s Mot. Dismiss at 8 n.3, ECF No. 21.)

status. By requiring a consumer report to reflect the current public record status, the provision mandates that any expunged charges, released tax liens, or dismissed judgments appear on the consumer report, thereby ensuring that the consumer report is not missing any pertinent updates or information. 15 U.S.C. § 1681k(a)(2).

Plaintiff relies on *Dalton v. Capital Associated Industries, Inc.*, 257 F.3d 409 (4th Cir. 2001) to argue that a violation of § 1681e(b) necessarily gives rise to a violation of 1681k(a)(2). In *Dalton*, the court held that because there existed a factual dispute over the reasonable procedures under § 1681e(b) there was also necessarily a factual dispute over the strict procedures under 1681k(a)(2). *Id.* at 417. While the court held that § 1681e(b) is comparable to § 1681k(a)(2), the basis for that comparison does not help Plaintiff here. Nowhere in its opinion did the *Dalton* court hold that the "accuracy" requirement under § 1681e(b) was interchangeable with the "completeness" requirement of § 1681k(a)(2). Instead, the court merely compared the two provisions based on the fact that each section mandates procedures to ensure a given result—the court assumed, without deciding, that the given result under each provision was similar enough to analogize. As discussed above, however, each provision seeks to ensure a different result. While 1681e(b) and 1681k(a)(2) each require a consumer reporting agency "to adopt certain kinds of procedures that must be designed to avoid . . . a particular result. The required result differs between the statutes . . . § 1681e(b) seeks to prevent the disclosure of an inaccurate report, and § 1681k(a)(2) seeks to prevent the disclosure of a report that is incomplete or not up to date." *Farmer v. Phillips Agency, Inc.,* 285 F.R.D. 688, 697 (N.D. Ga. 2012).

Plaintiff rebuts by invoking *Koropoulos v. Credit Bureau, Inc*., 734 F.2d 37 (D.C. Cir. 1984). In *Koropoulos*, the court analyzed the legislative history of § 1681e(b) and held that the "inaccuracy" provision also encompasses "incomplete" information. *Id.* at 40. The *Koropoulos* holding does not alter this Court's conclusion for two reasons. First, *Koropoulos* examined § 1681e(b), which is not the disputed provision at issue here. Second, just because "incomplete" is a lesser-included concept within "inaccurate," does not mean the opposite is true. A report missing pertinent information can be reasonably classified as both "incomplete" (it is missing information) and "inaccurate" (the missing information undermines its full accuracy). The reverse, however, is not true. A report not missing any information but containing factually false data can be deemed "inaccurate" (the information is false) but not "incomplete" (there is no information missing). Therefore, the court's holding in *Koropoulos* does not disturb this Court's conclusion.

Finally, Plaintiff cites *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147 (9th Cir. 2009) for the proposition that an item of information can be "incomplete" and "inaccurate" under the FCRA if the information is misleading in such a way that it can be expected to detrimentally affect decisions. *Id.* at 1161-64. Plaintiff overstates the holding, as the *Gorman* court never had occasion to address the issue before this Court. The statutory provision at issue in *Gorman* required agencies that furnished consumer information to conduct a reasonable investigation and report the results "if the investigation finds that the information is *incomplete or inaccurate*." 15 U.S.C.A. § 1681s-2(b)(1)(C)-(D) (emphasis added). Because the statutory section at issue in *Gorman* covered both "inaccurate" and "incomplete" information, the court simply had to articulate a common definition. The court was not faced with the task of deciding whether "inaccurate" information also qualifies as "incomplete" information because the statute already expressly resolved that issue. Thus, *Gorman* is inapposite.

Accordingly, the Court concludes that Plaintiff has failed to state a claim for violation of § 1681k(a)(2).

**D.   Willfulness**

Defendant next argues that Plaintiff has failed to plead sufficient facts to state a claim for wilful violation of FCRA §§ 1681e(b) and 1681k(a)(2).

A plaintiff can recover statutory and punitive damages for a willful violation of the FCRA. 15 U.S.C. § 1681n(a). The Supreme Court has defined "willful" violation as encompassing both knowing and reckless violations of a statutory provision under the FCRA. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

As a practical matter, determining whether a defendant's conduct was reckless turns on whether the defendant's reading of the FCRA was more than just "erroneous." Instead, the defendant's understanding of its statutory obligations must be "objectively unreasonable" in light of existing law, such as plain statutory language, judicial decisions, or Federal Trade Commission ("FTC") opinions clarifying the scope of FCRA. *Safeco.* 551 U.S. at 69-70.

Here, the Court finds that Plaintiff has failed to plead sufficient facts to state a claim of willful violations premised on FCRA §§ 1681e(b) and 1681k(a)(2), but has adequately alleged a willful violation of § 1681g(a).

Section 1681g(a) of the FCRA requires every consumer reporting agency to clearly and accurately disclose to a consumer, upon request, "[a]ll information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a). Plaintiff alleges that Defendant willfully violated FCRA § 1681g(a) based on "*repeated* failure to respond to Plaintiff's request for his full file." (SAC ¶ 28, ECF No. 20.) (emphasis in the original). Because there is no ambiguity in the plain language of the statute, the allegations that Defendant repeatedly violated this provision supports a plausible claim that Defendant's reading is "objectively unreasonable," or willful. *See Kirchner v. Shred-it USA Inc.*, No. CIV-2:14-1437, 2014 WL 6685210, at *2 (E.D. Cal. Nov. 25, 2014). Perhaps for this reason, Defendant does not challenge the sufficiency of Plaintiff's claim alleging willful violation of § 1681g(a).

Next, Plaintiff alleges that Defendant willfully violated §§ 1681e(b) and 1681k(a)(2) because it "should have known about its legal obligations," which are "well established in the plain language of the FCRA" and "have been in effect for decades." (SAC ¶¶ 20-22, ECF No. 20.) As the foregoing section illustrates, the interplay between § 1681e(b) and § 1681k(a)(2) is anything but plain, and there exists a dearth of judicial precedent on the matter. *Safeco*, 551 U.S. at 50 ("Given this dearth of guidance and the less-than-pellucid statutory text, [defendant's] reading was not objectively unreasonable, and so falls well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability."). Tellingly, Plaintiff fails to cite any FTC opinions or judicial precedent to substantiate his claim that Defendant's reading was objectively unreasonable. *See Syed v. M-I LLC*, No. CIV. 1:14-742, 2014 WL 4344746, at *2 (E.D. Cal. Aug. 28, 2014) (dismissing a claim alleging willful violation of a FCRA provision, in part, because the plaintiff failed to cite any legal authority showing clearly established law).

Plaintiff also claims that "Defendant obtained or had available substantial written materials that apprised it of its duties under the FCRA [§§ 1681e(b) and 1681k(a)(2) ]." (SAC ¶ 23, ECF No. 20.) Such a cursory statement without more factual support does not give rise to a plausible claim for willful violation. *Prescott v. HireRight Solutions*, CV-13-08953-MWF-PLAx at *21 (C.D. Cal. May 14, 2014) ("[T]he allegation that [defendant] received legal advice that it was required to [comply with a specific

provision of FCRA] is a conclusory assertion lacking a specific factual basis to render it plausible.").

Finally, Plaintiff posits that willfulness is an issue of fact to be determined by the jury, and, therefore, "unsuitable for determination in the motion to dismiss stage." (Pl.'s Opp. Mot. Dismiss at 9:4-5, ECF No. 23.) While Plaintiff is partially correct that *generally* the issue of willfulness is a fact-intensive inquiry left for the jury, that is not always true. Based on the Supreme Court's analysis in *Safeco*, a court may consider, as a matter of law, whether a defendant's interpretation of the FCRA was "objectively unreasonable, which bears directly on willfulness. *Safeco*, 551 U.S. at 69-70 (deciding whether defendant's interpretation of the FCRA was "objectively unreasonable" as a matter of law without remanding for further factual development); *see also Kirchner*, 2014 WL 6685210, at *2 ("*Safeco* 's analysis strongly suggests that the issue of whether a defendant's reading of the FCRA was 'objectively unreasonable' is a question of law."); *Syed*, 2014 WL 4344746 at *2 n.1 ("As a general rule, whether a defendant's conduct was 'willful' is a fact-intensive inquiry. However, Safeco 's analysis strongly suggests that the issue of whether a defendant's reading of the FCRA was 'objectively unreasonable' is a question of law.").

Accordingly, Plaintiff has not sufficiently alleged willful violations of §§ 1681e(b) and 1681k(a)(2).

## V.  <u>CONCLUSION</u>

In light of the foregoing, Defendant's Motion to Dismiss the SAC is **GRANTED** as to the following claims:

(1) All claims alleging violations of the ICRAA

(2) The claim alleging negligent violation of 15 U.S.C. § 1681k(a)(2)

(3) The claims alleging willful violations of 15 U.S.C. §§ 1681e(b) and 1681k(a)(2)

**<u>IT IS SO ORDERED.</u>**

<u>                    </u> <u>:</u> <u>            </u>

<u>Initials of Preparer</u> <u>                    </u>

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

KEVIN JONES, on behalf of himself and : 
others similarly situated, :

                 :

                 Plaintiffs, :

                 :

         -against- :

                 :

STERLING INFOSYSTEMS, INC., :

                 :

             Defendant. :

------------------------------------------------------------ X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:__3/30/2016__ |

14-CV-3076 (VEC)

ORDER

VALERIE CAPRONI, United States District Judge:

        Plaintiff seeks to certify a nationwide class in order to pursue his claim that Sterling

Infosystems, Inc. ("Sterling") willfully violates the federal Fair Credit Reporting Act ("FCRA")

and its New York analogue when it reports criminal records obtained from the New York Office

of Court Administration ("NYOCA")[1] for employment purposes. Defendant opposes class

certification, arguing that Plaintiff has not satisfied his burden to demonstrate that the

requirements of Rule 23 of the Federal Rules of Civil Procedure have been met. Because

Plaintiff has not demonstrated that a class action is the appropriate vehicle to rectify the wrong

that Plaintiff alleges Sterling perpetrated, Plaintiff's motion for class certification is DENIED.

## BACKGROUND

        Kevin Jones lost a job with Halstead Management Company because Sterling, which had

been hired to do a criminal background check on him, reported that he had four criminal

convictions when, in fact, he had none. The mistake by Sterling was the result of the facts that

---

[1]     New York State has centralized and monetized the process for obtaining criminal records for employment purposes. NYOCA maintains a portal for electronic searches of criminal records. The portal requires a first and last name and a date of birth. The portal will return only an exact match and only returns middle names and initials if they are part of the underlying record. Def. Sterling Infosystems, Inc.'s Br. in Opp'n to Pl.'s Mot. for Class Certification ("Def. Opp'n") at 3 (Dkt. 44). The NYOCA does not necessarily return other identifying information, including aliases and social security numbers. *See generally* Decl. of Curt Schwall ("Schwall Decl.") (Dkt. 45-1).

there are (at least) two Kevin Joneses in New York with the same date of birth, at least one of whom has a criminal record, and prior to disseminating its report, Sterling did not match all of the identifying information that was available in the court records to the information it had regarding the applicant Kevin Jones in order to determine whether the records it reported related to the correct Kevin Jones. Mem. of Law in Supp. of Pl.'s Mot. for Class Certification ("Pl. Mem.") at 10-14 (Dkt. 39).

Jones seeks to certify a Rule 23(b)(3) class of employees or applicants for employment anywhere in the United States who were the subject of a report sold by Defendant for employment purposes that contained at least one criminal conviction in New York.[2]  In addition, the Plaintiff seeks to certify for injunctive relief a subclass of all members of the class who are residents of New York State under Rule 23(b)(2). Pl. Mem. at 3. Plaintiff asserts that Sterling willfully violates the FCRA because it never sends notice to the person about whom it is reporting adverse information, and it never provides complete records. Accordingly, he argues, a class action is appropriate because Sterling violates the statute every time it reports adverse criminal information for employment purposes.

---

[2]	Plaintiff defines the class in his Complaint as:

> All employees or applicants for employment residing in the State of New York (a) who were the subject of a report sold by Defendant to a third party, (b) that was furnished for an employment purpose, (c) that contained at least one public record of a criminal conviction or arrest, civil lien, bankruptcy or civil judgment, (d) within two years from the date of the filing of this action through and during the pendency of this action, and (e) to whom at the same time it furnished an electronic report, Defendant did not provide electronic notice to the consumer stating that a report was being furnished and containing the name of the person that was to receive the report, or to whom within one hour of when it furnished a non-electronic report Defendant did not mail notice to the consumer stating that a report was being furnished and containing the name of the person that was to receive the report.

Compl. ¶ 47(a).  In his motion for class certification, Plaintiff revised the proposed class definition to extend the territorial scope of the proposed class to those residing in "the United States and its Territories" and to limit the contents of the public record to "*New York* public records of a criminal conviction or arrest," but not a civil lien, bankruptcy or civil judgment.  Pls. Mem. at 3 (emphasis added).

## DISCUSSION

### I.        Fair Credit Reporting Act

Jones is pursuing class certification only for his claims that Sterling willfully violated

FCRA section 1681k(a), 15 U.S.C. § 1681k(a), and its New York analogue, the New York Fair

Credit Reporting Act ("NY-FCRA") section 380-g, N.Y. Gen. Bus. Law, § 380-g.[3]  He has also

asserted an individual claim that Sterling also violated section 1681e(b) of the FCRA, which

requires credit reporting agencies ("CRAs") to follow reasonable procedures to assure accuracy

in the information they report.  Compl. at Count VI (Dkt. 2).

The FCRA is a complicated statute that "was crafted to protect consumers from the

transmission of inaccurate information about them, and to establish credit reporting practices that

utilize accurate, relevant, and current information in a confidential and responsible manner."

*Guimand v. Trans Union Credit Info. Co*., 45 F.3d 1329, 1333 (9th Cir. 1995).  The provision at

issue in Plaintiff's motion for class certification, section 1681k(a), relates to the portion of the

business of CRAs that involves reporting public record information (such as arrests and

convictions) in the employment context.  When a CRA is reporting matters of public record that

are likely to have an adverse effect on a person's ability to obtain employment, section 1681k(a)

requires the CRA to do one of two things: either provide notice to the subject of the report when

the report is transmitted or

> maintain strict procedures designed to insure that whenever public record information
> which is likely to have an adverse effect on a consumer's ability to obtain employment is
> reported it is complete and up to date.  For purposes of this paragraph, items of public
> record relating to arrests, indictments, convictions, . . . and outstanding judgments shall

---

[3]        The two statutes are substantially similar.  For ease of reading, this opinion will generally cite only the
federal statute.

be considered up to date if the current public record status of the item at the time of the report is reported.

15 U.S.C. § 1681k(a)(1), (2).

It is undisputed in this case that Sterling does not provide notice to the subject of the reports. Def. Opp'n at 11. Accordingly, a critical issue to be tried is whether Sterling has "strict procedures" that are designed to ensure that the information it reports is "complete and up to date."

Plaintiff's original position was that the statute obligates Sterling to provide a "complete" record, meaning not just the disposition of a criminal case, but every event associated with that criminal conviction (*e.g.,* the date of arrest; arraignment; status conferences). Tr. of Oral Arg., Feb. 10, 2016 ("Tr.") at 5-7 (Dkt. 62-1). Counsel for Plaintiff cited no precedent for that expansive interpretation, and, when required to brief specifically what constitutes a "complete" record under the statute, Plaintiff shifted his position to argue that a "complete" record is one that includes, at a minimum, "all *personal identifying information* from the underlying publicly available courthouse records – such as actual first name, middle name, last name, social security number, address, and the date of birth of the person convicted." Pl.'s Suppl. Br. in Further Supp. of Mot. for Class Certification ("Pl. Suppl.") at 2 (Dkt. 63) (emphasis in original). Defendant argues that in the context of section 1681k(a), which defines "up to date" but does not define "complete," and reading that section in the context of the entire statute, "complete and up to date" means the "current status of the public record." Def. Sterling Infosystems, Inc.'s Suppl. Br. in Opp'n to Pl.'s Mot. for Class Certification: the Meaning & Interpretation of the Word

"Complete," as Used in 15 U.S.C. § 1681k(a)(2) and N.Y. Gen. Bus. Law § 380-g(b) ("Def. Suppl.") at 2 (Dkt. 61).

Defendant is correct that the Court must look at the entire statutory scheme in order to determine the meaning of "complete and up to date." Plaintiff's proffered definition would make some sense if the purpose of § 1681k(a)(2) were to prevent criminal records from being attributed to the wrong person, as occurred here. If that were the purpose, then requiring the CRA to report all identifying information in the record might minimize, if not entirely eliminate, the problem that arises when there is more than one person with the same first and last name and birthdate. The problem with Plaintiff's argument is that there is an entirely different section of the statute (under which Plaintiff is pursuing an individual claim) that is designed exactly for that purpose. Section 1681e(b) requires CRAs to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of reports that are published. Having already mandated reasonable procedures to ensure accuracy, it does not make sense that Congress would have imbued in the word "complete" the obligation Plaintiff advocates. *See Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 697 (N.D. Ga. 2012).

Plaintiff relies on a recent decision from the Eastern District of Virginia that grappled with this question in the context of a motion for summary judgment. In *Henderson v. Corelogic National Background Data, LLC*, ---F. Supp. 3d ---, No. 3:12CV97, 2016 WL 685127 (E.D. Va. Feb. 18, 2016), the court observed that "the parties have not cited, nor has the Court found, a decision determining whether a consumer report can be 'complete' when it includes adverse public record items that pertain to consumers other than the subject consumer." *Id*. at *10. That court held that there was a question of fact whether the defendant maintained "strict procedures" noting that "[i]t simply is not complete under FCRA to say that 'someone named Bill Jones has a

conviction record, but whether this is the Bill Jones you are inquiring about, I do not know.'" *Id.* at *11.

While this Court understands the *Henderson* court's frustration, its analysis conflated the CRA's obligation under section 1681e(b) to have "reasonable procedures" to deliver accurate records[4] with its obligation under 1681k(a) to have "strict procedures" to deliver complete and up to date records.

The most reasonable view of the phrase "complete and up to date" is the one pressed by Sterling. The Court begins with the text of the statute and reviews the statute as a whole, as the Supreme Court instructs we must. *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]hen deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme. Our duty, after all, is to construe statutes, not isolated provisions." (internal quotation marks and citation omitted)). As noted earlier, neither section 1681k(a)(2) nor the FCRA defines the term "complete." Under the canon of construction of *noscitur a sociis*, a word that is capable of many meanings "is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). The meaning of the word "complete" in section 1681k(a)(2) is susceptible to multiple and wide-ranging meanings, so its intended meaning must be determined in light of its use as part of the phrase "complete and up to date," and the second sentence of the provision: "[f]or purposes of this paragraph, items of public record relating to arrests, indictments, convictions, . . . and outstanding judgments shall be considered up to date if the current public record status of

---

[4]      As the *Henderson* court observed, federal courts have noted that the "strict procedures" requirement of 1681k(a) is necessarily more stringent than the "reasonable procedures" required by 1681e(b). 2016 WL 685127 at *12 (citing *Poore v. Sterling Testing Sys. Inc.*, 410 F. Supp. 2d 557, 572 (E.D. Ky. 2006)). This Court has to wonder whether even the more lenient standard can be met when the CRA's procedures allow the wrong person's criminal history to be reported – particularly when the person has a common name. Given the detrimental effect on an employment applicant of being erroneously branded a criminal to his prospective employer, surely it is not "reasonable" to report a criminal conviction *prior* to ensuring that it applies to the right person.

the item at the time of the report is reported." 15 U.S.C. § 1681k(a)(2). The plain language of

section 1681k(a)(2) supports interpreting "complete" in the context of the currency of the

reported public records. On the statute's face, Congress identified the types of public record

items with which it was concerned —*i.e.*, records relating to arrests, indictments, convictions,

etc.—and highlighted its concern about "the current public record status of the item at the time of

the report." *Id.*

      This interpretation is further supported by the language of the FCRA as a whole. "'The

meaning of a particular section in a statute can be understood in context with and by reference to

the whole statutory scheme, by appreciating how sections relate to one another. . . . [T]he

preferred meaning of a statutory provision is one that is consonant with the rest of the statute."

*I.R.S. v. WorldCom, Inc. (In re WorldCom, Inc.)*, 723 F.3d 346, 355 (2d Cir. 2013) (quoting

*Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002)), *cert. denied, WorldCom,*

*Inc. v. I.R.S.*, 135 S. Ct. 56 (2014). As discussed above, section 1681e(b) is more obviously

tailored to Plaintiff's complaint of inaccurate attribution of public records because 1681e(b)

requires CRAs to employ "reasonable procedures to assure maximum possible accuracy of the

information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). It

therefore makes sense to read section 1681k(a)(2) to address a different concern – namely, the

obligation of the CRA to report current (as opposed to outdated) records. *Jerman v. Carlisle,*

*McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 588 (2010) ("[T]he existence of a separate

provision that, by its plain terms, is more obviously tailored to the concern at issue . . . weighs

against stretching the language of the [statutory provision] to accommodate [an] expansive

reading").

      To the extent there is any ambiguity in the words of the statute, the legislative history

further supports narrowly interpreting the phrase "complete and up to date" to address only the

current public record status.  An early version of the bill included language identical to section 1681k(a)'s final form and required that a CRA "maintain strict procedures designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date."  S. 823, 91st Cong., 1st Sess. § 613 (Nov. 5, 1969); *see also* S. Rep. No. 91-517, 91st Cong., 1st Sess., at 4 (Nov. 5, 1969) (Report of the Committee on Banking and Currency accompanying the proposed bill).  Specific to the handling of public record information, the report accompanying the proposed bill from the Senate's Committee on Banking and Currency identified the problem Congress was trying to address:

> Most credit bureaus systematically compile public record information such as records of suits, tax liens, arrests, indictments, convictions, . . . judgments and the like.  This information is then included on a person's report . . . when he applies for employment.  Unfortunately, the information cannot always be kept up to date either because it is costly or because the correct information is simply not available.  Thus, it is possible for a credit bureau to report a record of a suit or arrest without indicating that the suit was dismissed or the arrest charges dropped.  Because public record information is reported to employers as well as creditors, a consumer's future employment career could be jeopardized because of an incomplete credit report.

S. Rep. No. 91-517, 91st Cong., 1st Sess., at 4 (Nov. 5, 1969).  In the section-by-section analysis specific to this provision, the Committee reiterated that "[r]eporting agencies cannot report adverse items of public record information for employment purposes unless they maintain strict procedures to keep the information up to date."  *Id.* at 7.  When the FCRA was ultimately enacted, the final bill contained the language of Section 1681k(a)(2) in its current form.  Pub. L. No. 91-508, § 613, 84 Stat. 1114, 1133 (Oct. 26, 1970).  The legislative history surrounding the bill's final enactment again makes clear that Congress wanted to ensure that reporting agencies maintain strict procedures "to verify the current status of such public record items" when

reporting adverse public record information.  116 Cong. Rec. H 10048, 10052 (daily ed. Oct. 13, 1970) (statement of Rep. Sullivan).

Finally, the Federal Trade Commission ("FTC"), the agency responsible for enforcing many of the FCRA provisions, offered staff guidance that further supports the view that "complete and up to date" means the current status of public record items.  *See Farmer*, 285 F.R.D. at 696-97 (citing the same FTC guidance as persuasive authority in the interpretation of section 1681k(a)).  The FTC explained that the provision:

> require[s] only that each [public record] *item* reported be complete and up to date. For example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report.  Similarly, if the CRA reports a conviction, it must report a reversal that has occurred on appeal.

FTC, Div. of Fin. Practices, Staff Opinion Letter, 1999 WL 33932137 (Dec. 16, 1999) (emphasis in original).

Because section 1681k(a)(2) only requires a CRA to report the current public record status of an item, Plaintiff's interpretation that renders NYOCA records uniformly incomplete is incorrect.[5]

## II.    Class Certification under Rule 23(b)(3)

### A.  Legal Standard

"'The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 79 (2d Cir. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (other quotation marks omitted)).  "A district court may only certify a class if it determines that

---

[5]    This interpretation of "complete" is also applicable to the NY-FCRA.  The NY-FCRA requires that CRAs "maintain reasonable procedures" to ensure that reported public record information is "complete and up to date" and states that to meet this requirement, a CRA must "accurately report the status of public record information as of the date recorded in its files provided such information is updated on a regular basis."  N.Y. Gen. Bus. Law § 380-g(b). Similar to the FCRA, the focus is on the up to date status of the public record information.

each Rule 23 requirement is met," *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 464 (2d Cir.

2013), and "[t]he party seeking class certification bears the burden of establishing by a

preponderance of the evidence that each of Rule 23's requirements have been met," *Johnson v.*

*Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

A district court may certify a class only if the class meets all of the requirements of Rule

23(a) and the relevant requirements of Rule 23(b). "Regardless of whether class certification is

contested, a court may not certify a putative class unless it has performed a 'rigorous analysis'

and determined that each of Rule 23's requirements has been met." *Animal Sci. Prods. v. Hebei*

*Welcome Pharm. Co. Ltd. (In re Vitamin C Antitrust Litig.)*, 279 F.R.D. 90, 98 (E.D.N.Y. 2012)

(quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)). This "rigorous analysis" sets

a higher standard than "a mere pleading standard," *Ohio Pub. Emps. Ret. Sys. v. Gen.*

*Reinsurance Corp. (In re AIG Sec. Litig.)*, 689 F.3d 229, 237-38 (2d Cir. 2012) (quotation marks

omitted).

A class action is appropriate:

only if (1) the class is so numerous that joinder of all members is impracticable; (2)
there are questions of law or fact common to the class; (3) the claims or defenses
of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the
class.

Fed. R. Civ. P. 23(a). In addition to meeting the requirements of Rule 23(a), to certify a class

pursuant to Rule 23(b)(3), a plaintiff must establish that "both (1) 'questions of law or fact

common to class members predominate over any questions affecting only individual members,'

and (2) 'a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)

(quoting Fed. R. Civ. P. 23(b)(3)). "'While the text of Rule 23(b)(3) does not exclude from

certification cases in which individual damages run high, the Advisory Committee had

10

dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.'" *Sykes*, 780 F.3d at 81 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)). Although Rule 23(b)(3) "'does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof,'" *id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1196 (2013) (alterations omitted, emphasis in original)), it "imposes a 'far more demanding' inquiry into the common issues which serve as the basis for class certification" than does Rule 23(a), *id.* (quoting *Amchem*, 521 U.S. at 623-24).

Determining whether to certify a class under Rule 23 will frequently require some evaluation of the merits of the plaintiffs' underlying claim. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). "But the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen*, 133 S. Ct. at 1191. "'Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *Fezzani v. Bear, Stearns & Co.*, 777 F.3d 566, 570 (2d Cir. 2015) (quoting *Amgen*, 133 S. Ct. at 1194-95).

### B. Plaintiff Has Not Met His Burden of Proof To Show that Class Certification Is Appropriate

In this case, Plaintiff's motion to certify founders on at least two requirements: he has not demonstrated that questions of fact common to class members predominate over questions affecting only individual members as required by Rule 23(b)(3), and he has not demonstrated

numerosity as required by Rule 23(a).  Because those two failings are fatal, the Court need not

and will not discuss the other requirements (others of which are also problematic for Plaintiff).

### 1.  Common Questions of Law and Fact Do Not Predominate

To determine whether Plaintiff has met his burden on predominance, a court "must assess

(1) the 'elements of the claims and defenses to be litigated'; and (2) 'whether generalized

evidence could be offered to prove those elements on a class-wide basis or whether

individualized proof will be needed to establish each class member's entitlement to relief."

*Johnson*, 780 F.3d at 138 (quoting 1 Joseph M. McLaughlin, *McLaughlin on Class Actions*

§ 5:23 (11th ed. 2014)).  The mere existence of individual inquiries does not doom a potential

class; Rule 23(b)(3) "anticipates the existence of individual issues."  *Sykes*, 780 F.3d at 87.  What

will doom a class, however, is the determination that common issues will be overwhelmed by

individual issues.  Again, while Rule 23(a)(2) requires commonality, the predominance

requirement of Rule 23(b)(3) "imposes a 'far more demanding' inquiry."  *Id.* at 81 (quoting

*Amchem*, 521 U.S. at 623-24).  In order to satisfy the predominance requirement, the proposed

class must be "'sufficiently cohesive to warrant adjudication by representation.'"  *In re AIG Sec.*

*Litig.*, 689 F.3d at 239-40 (quoting *Amchem*, 521 U.S. at 623).  The predominance inquiry

frequently hinges on whether elements of each class member's case can be proven through

generalized proof, and whether the issues that can be so proven are more substantial than the

issues subject only to individualized proof.  *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121,

131 (2d Cir. 2010).  A court must "give careful scrutiny" to the relationship between common

questions, "where 'the same evidence will suffice for each member to make a prima facie

showing [or] the issue is susceptible to generalized, class-wide proof,'" and individual questions,

"where 'members of a proposed class will need to present evidence that varies from member to

member.'" *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1146, 2016 WL 1092414 (U.S. Mar. 22, 2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions*, § 4:50 (5th ed. 2012)).

In order to determine predominance, the Court must start with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011). Probably because Plaintiff proceeded from an incorrect view of what he will have to prove, he failed to address how, applying the correct burden of proof, common questions will predominate. Judge O'Kelley addressed just this issue in the *Farmer* case. There, as here, the CRA defendant admitted that it does not send notice to the subjects of the reports it prepares. Thus, there, as here, "Defendant's non-compliance with § 1681k(a)(1) is subject to generalized proof." *Farmer*, 285 F.R.D. at 702.

The problem in this case, as in *Farmer*, comes when Plaintiff attempts to prove that Sterling willfully failed to comply with § 1681k(a)(2). To show that:

> each class member must demonstrate that defendant: (1) furnished a consumer report containing potentially adverse information about that consumer; (2) failed to maintain strict procedures when it reported the adverse information; and (3) furnished a consumer report containing adverse information that was either incomplete or not up to date.

*Id*. at 700, 702; *see also Henderson*, 2016 WL 685127, at *10; *Obabueki v. Int'l Bus. Mach.*, 145 F. Supp. 2d 371, 396 (S.D.N.Y. 2001).

Starting with the last element of the *prima facie* case: in light of this Court's interpretation of the word "complete," it will obviously be an intensively individualized inquiry to determine whether the information reported on any given class member was complete and up to date. The scope of that inquiry will necessarily be specific to each individual report.

The second element, whether Sterling maintains strict procedures designed to ensure that information it reports is current and up to date, is not subject to proof that is generally applicable to the class because Sterling has presented evidence, which was not contradicted by Plaintiff, that

its procedures have changed over time.  Schwal Decl. ¶¶ 12, 14, 16, 17.  Because its procedures have changed over time, the proof as to the procedures used to generate any given report will vary.  As with *Farmer*, "[a]lthough there will be some general factual overlap" regarding the procedures used by Defendant, there will also be significant differences over time.  The difficulty with trying this case as a class action would be that each individual class member would have to prove that the procedures used to generate his or her report were not "strict procedures" and that Sterling was, at the time it generated that class member's report, acting willfully in not having strict procedures.[6]

Because highly individualized inquiries with regard to whether a particular report was complete and up to date and whether the procedures used to generate that report were "strict procedures" will predominate over the common issues, Plaintiff has not demonstrated that the predominance requirement is met.

## 2.  Numerosity

"To meet the requirements of Rule 23(a)(1), the class must be so large that joinder of all members would be impracticable."  *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (quotation marks omitted).  "Numerosity is presumed for classes larger than forty members."  *Penn. Pub. Sch. Emps. Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014).  This requirement, however, "is not strictly mathematical but must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii)

---

[6]     Because Sterling's procedures varied over time, it would be totally unmanageable to try this case on a class basis.  While a jury is more than competent to hear testimony regarding the procedures that were in place when a particular report was prepared and to decide whether those procedures were "strict procedures" (or, for that matter, "reasonable procedures") as required by the statute,  it would be unreasonable to expect a jury to hear testimony regarding all of the various twists and turns of the procedures that are applicable to some but not all members of the class and then determine as to each variation whether the procedures were "strict procedures" at that point.

the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members." *Id.*

In this case, Plaintiff has not proven that the class will be so numerous that joinder is not practicable. Largely because he started with an erroneous view of the elements of a *prima facie* case, he relied on the fact that almost 5,000 background reports were sold by Sterling for employment purposes that contained information obtained through NYOCA that related to a person with a then-current address in New York State between May 2, 2012 and January 20, 2015. Pl. Mem. at 17; Decl. of James Francis (Dkt. 40) Ex. 24 at 6 (Def.'s Suppl. Interrog. Resp. at No. 9). But that is the universe of persons on whom Sterling reported information; it is not the universe of persons as to whom Sterling reported information that was not complete and up to date. Plaintiff, who has the burden to show class certification is appropriate, has provided no information regarding the size of the smaller group of actual class members. Because Plaintiff has offered no evidence of the number of persons affected by records that were not complete and up to date, Plaintiff has failed to satisfy his burden to prove numerosity.

Because Plaintiff has failed to demonstrate predominance or numerosity, his motion for class certification must be denied.[7]

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Class Certification is DENIED. The Clerk of the Court is respectfully directed to terminate Dkt. 33.

Counsel for all parties are directed to appear before the undersigned for a status conference on **April 22, 2016 at 10:00 a.m.** On or before **April 15, 2016**, the parties must submit a joint letter to the Court proposing a schedule for dispositive motions (if either side plans

---

[7]     Plaintiff's failure to prove numerosity is also fatal to his motion to certify a subclass of New York residents pursuant to Rule 23(b)(2).

to file such motions) or trial (if neither side plans to file dispositive motions). Finally, because the Defendant did not renew its request to file certain materials contained in its Brief and Supporting Declaration in Opposition to Plaintiff's Motion for Class Certification under seal, *see* Memo Endorsement dated April 27, 2015 (Dkt. 46), the Defendant is directed to file appropriately un-redacted documents on the public record on or before April 8, 2016.

**SO ORDERED.**

**Date:  March 30, 2016**
        **New York, NY**

_____
                    **VALERIE CAPRONI**
                    **United States District Judge**

# EXHIBIT 3

find its way as easily into the files of the credit bureau as does the merchant's version.

Third. Malicious gossip and hearsay: Perhaps the most serious misinformation in credit reporting agency files is malicious gossip and hearsay. This type of information is most prevalent in the files of credit reporting agencies which specialize in investigating people who apply for insurance or employment. The information is often obtained from neighbors or coworkers where the opportunity is ripe for anonymous character assassination. These kinds of investigations usually include detailed information on highly personal items such as drinking habits, marital strife, private morals, and the like. Many people have written to me citing specific examples of this kind of abuse. Some of these cases are as follows:

A Maine housewife has lost virtually all her credit and her life, hospital, and car insurance due to "bad morals" cited in a credit report. The reason? For 12 years she has been a common law wife to a man whose wife will not divorce him.

A college student from Ohio lost his car insurance on the strength of a neighbor's secret testimony.

A Pennsylvania woman was turned down for major medical coverage by an insurance company. After repeated interviews with company officials and the Pennsylvania insurance commissioner, the woman's husband finally learned the reason. A credit report indicated she was an alcoholic. In actual fact, the woman had never consumed more than a dozen drinks in 20 years of married life.

A Florida insurance man with 20 years of experience writes that credit investigations are frequently characterized by hearsay evidence, inaccuracies, incompetent investigators, and snide insinuations.

The attitude of credit reporting industry officials on hearsay evidence is not exactly reassuring. For example, the general counsel of Retail Credit testified at a recent hearing. "What's wrong with hearsay? We all operate on hearsay everyday. We couldn't have a civilized society without hearsay."

Fourth. Computer errors: With the growing trend toward computerization, the incidence of computer errors is on the increase. Such errors are particularly prevalent during periods of conversion when all of the "bugs" in the new computer system have not yet been worked out. For example, a California credit reporting agency mistakenly labeled a whole file drawer of good credit risks as bad credit risks. I have received numerous letters from people badgered by computer written letters hounding them to pay for goods never received.

A young Wisconsin housewife has written me about her experience with a major oil company which for some reason failed to send a bill for 2 months. To quote from her letter:

In September, my husband and I received an overdue bill notice. We paid the amount at once and sent with it a covering letter explaining that my change of name and address probably confused their billing department. In reply, we received a letter demanding payment of the same overdue bill and

return of our credit cards. At this point, we were only too happy to get rid of the cards, but we still owed the . . . Corporation more than they had attempted to collect . . . We have sent two letter requesting to be billed. Eventually, the . . . Corporation will tell us the amount we still owe, and we will pay. But their computer will have recorded us as delinquent, and a poor credit rating will be foisted on us as a result of *their* mistake. As young marrieds, we are just beginning to need a good credit rating. This company's mistakes can cause us grief.

A highly knowledgeable aerospace engineer has written:

I am especially concerned by the possibilities of error afforded by computer systems, which spew forth incorrect data and half-truths due to the dogmatic nature of computer programming and the limitations of human operations. We desperately need legislation to protect all of us.

Recently, the "Judd for the Defense" TV program dramatized the case of a man who lost his job and ultimately his sanity as a result of a credit bureau computer error. The transcript of this program appears on page S684 of the RECORD for January 22.

Fifth. Incomplete information? Because of the increased computerization and standardization of credit bureau files, all of the relevant information is not always reflected in a person's file. For example, one housewife had difficulty obtaining credit. She finally discovered the credit bureau had categorized her as a "slow payer" despite the fact that the credit manager at the store involved was fully aware of and had agreed to the extenuating circumstances causing the late payment. However, under the credit bureau's file system, these additional facts were not recorded. The trend toward standard computerized reporting should increase this type of inaccuracy.

Recently the Consumer Finance News reported the case of a man repeatedly rejected for bank loans for no apparent reason. It turned out the banks were relying on an unfavorable credit report from a computerized credit bureau. Some years earlier, the man had missed several payments on his auto loan due to a severe injury. Although the man obtained the specific permission of the lending offices to delay the payments, the computer showed only that the payments were late.

Another type of incomplete information is concerned with adverse items of public records. Most credit reporting agencies assiduously cull adverse information on people from newspapers, court records, and other public documents. These items include records of arrests, judgments, liens, bankruptcies, suits, and the like. However, most agencies are not anywhere near as diligent in following up on the case to record information favorable to the consumer. Action following arrest is often dropped because of a lack of evidence. Suits are dismissed or settled out of court. Judgments are reversed. However, these facts are seldom recorded by the credit reporting agencies with the result that their records are systematically biased against the consumers.

To cite but one example of this type

of abuse, let me recount the experience of a California man who recently wrote to me. He was falsely arrested and convicted of a felony in 1962 on a case of mistaken identity. In 1963 the real criminal confessed. Despite his innocence, the man has never been able to obtain any credit since even though he is a successful real estate broker.

CORRECTING ADVERSE INFORMATION

The problem of inaccurate information is compounded by the difficulty consumers have in getting their adverse records corrected. It would be unrealistic to expect credit reporting agencies to be absolutely accurate on every single case. But it seems to me that consumers affected by an adverse rating do have a right to present their side of the story and to have inaccurate information expunged from their file. Considering the growing importance of credit in our economy, the right to fair credit reporting is becoming more and more essential. We certainly would not tolerate a Government agency depriving a citizen of his livelihood or freedom on the basis of unsubstantiated gossip without an opportunity to present his case. And yet this is entirely possible on the part of a credit reporting agency.

There are a number of reasons why it is difficult for consumers to correct inaccurate information.

First, many consumers simply are unaware of the existence of credit reporting agencies or of the fact that their file contains inaccurate information. A person who applied for credit and is turned down is not always told the reason. In the absence of such disclosure he may not connect the rejection with an adverse credit rating, particularly if he has a limited education and is less sophisticated about financial matters.

Even more serious is the practice of many retailers of not even informing a person he has been rejected for credit. His application is simply pigeonholed. In such a case, the individual does not know whether his application is rejected, lost, or merely pending. He would thus have no way of knowing a credit reporting agency is sending out adverse information on him which may be entirely inaccurate.

But the most disturbing fact of all is that the service agreement between some credit reporting agencies and its business customers prohibits the customer from disclosing the identity of the credit reporting agency to any consumer. For example, until recently a standard service contract of the Retail Credit Agency required its clients to agree that "all reports, whether oral or written, will be kept strictly confidential; except as required by law, no information from reports nor your identity as the reporting agency will be revealed to the persons reported on."

To illustrate the workings of this clause, let us assume Retail Credit investigated an applicant for an insurance policy. Let us further assume the report included a completely baseless charge that the person was an alcoholic. As a result of the report, the insurance company rejects the person for insurance. However, the company is precluded by

# EXHIBIT 4

When we asked whether this information could be verified in writing, we received a full credit report plus a letter from the Credit Bureau's manager expanding on the report to include items from their local records. Printed across the bottom of the credit report form was the declaration: "The above information is furnished in response to an inquiry for the purpose of evaluating credit risks." Furthermore, the Bureau Manager indicated by telephone that he would be willing to have an investigator talk to former employers and fellow employees to obtain more detailed information if this were desired.

All of this was done, incidentally, without charge to us, "as a courtesy," the manager indicated, even though we offered to pay the customary fees. This may have been intended as a gesture of goodwill towards a university center, but it was an outrageous disclosure of personal information and a breach of this woman's privacy. If I could obtain a credit report this easily, I cannot help wondering whether there is any security and confidentiality for personal information held in the Greater New York Credit Bureau. And, one must ask, is this Bureau—with its 8.5 million individual files, 3 million annual reports, and 500 employees—typical of many others throughout the nation?

Secondly, recent reports have also raised questions about the accuracy of credit reporting, and whether individuals are now able to correct mistakes or inaccuracies that can cut them off unfairly and even permanently from credit privileges. These issues can be grouped under three headings: errors of identification; incomplete information; and biased reporting. Let me give one example of each from the recent record:

1. *Errors of Identification.*—The *Wall Street Journal* related recently that a Manhattan lawyer and state assemblyman had been turned down by a major credit card company. He was able to learn that it was because of an unfavorable credit bureau report. When he contacted the bureau, all they would say is that his record was "unfavorable." It took repeated calls stressing that he was a state legislator to get the bureau to let him see the derogatory item (a lawsuit judgment outstanding)—and to inform the bureau that no such judgment had ever been obtained against him. Further checking showed that the case involved a man with a similar name. "I'm an assemblyman," the legislator noted. "What happens to the poor guy who walks in off the street with no leverage of any kind?" [18]

2. *Incomplete information.*—An example of incompleteness is the treatment of police and court records in the credit process. Credit bureaus rely heavily on newspaper accounts and court records dealing with both civil and criminal actions involving individuals in the bureau's geographic area. Arrests, lawsuits filed, divorce petitions filed, and convictions are collected systematically and are rushed into the individual's files. But the credit reporting system displays serious flaws in obtaining and recording information about arrests that lead to dismissed charges or even expunged police records because of unjustified arrest; or about lawsuits settled out of court; or suits that represented only pressure in a bargaining situation; or convictions reversed on appeal in a higher court. [19] The long gap between filing a lawsuit and trial can leave an individual "prejudged" for credit purposes before he gets his legal day in court. Credit organizations have expressed their concern at this problem, but they have yet to develop on their own a realistic way of coping with it. I do not think they will find one as long as there is no requirement of notification to the individual that a derogatory public record has been entered in his file and no opportunity for him to explain its nature or report on its disposition.

3. *Biased reporting.*—When buyer and seller disagree over the quality of the merchandise delivered, buyers sometimes withhold payments to insure rectification of the condition. Especially when some hot words are exchanged, the seller may report this as simply non-payment or slow payment, creating a bad credit record that the individual would not know about and, therefore, would not be able to correct.

---

[1] *Wall Street Journal*, op. cit., p. 1. [Assemblyman Straub has since introduced a bill in Albany which would require New York credit bureaus to provide an individual with a copy of his credit record.]

[2] "The Blood Bank of your Economic Life: Credit Bureau of Phoenix," *Phoenix Republic, Arizona* (Sunday supplement magazine). [This article was furnished by ACB of A and does not carry a date.] See also Vance Packard, *op. cit.*, p. 172; Arthur R. Miller, "The National Data Center and Personal Privacy," *The Atlantic Monthly*, November, 1967, p. 55; Kenneth L. Karst, "'The Files': Legal Controls Over the Accuracy and Accessibility of Stored Personal Data," Law and Contemporary Problems, Vol. 31, No. 2, Spring, 1966, p. 372.

# EXHIBIT 5

A fourth problem is that the information in a person's credit file is not always kept strictly confidential. As an example, a reporter for a major TV network was able to obtain 10 out of 20 reports requested at random from 20 credit bureaus by using the name of a completely fictitious company under the guise of offering the individuals credit.

A fifth problem is that investigative type credit reports sometimes gather highly sensitive and personal information about a person's private life, such as racial or ethnic descent, domestic trouble, housekeeping habits, and conditions of yard. Moreover, because of its very nature much of the information on a person's general character, habits and morals is based on someone's subjective opinion rather than objective fact. Some of the information collected on investigative reports may be only marginally related to the purpose of granting credit or insurance and may tend to invade the individual's right to reasonable privacy.

A sixth problem deals with the handling of public record information. Most credit bureaus systematically compile public record information such as records of suits, tax liens, arrests, indictments, convictions, bankruptcies, judgments and the like. This information is then included on a person's report when he applies for credit, or in some cases when he applies for employment. Unfortunately, the information cannot always be kept up to date either because it is costly or because the correct information is simply not available. Thus, it is possible for a credit bureau to report a record of a suit or arrest without indicating that the suit was dismissed or the arrest charges dropped. Because public record information is reported to employers as well as creditors, a consumer's future employment career could be jeopardized because of an incomplete credit report.

A seventh problem is concerned with the reporting of information about a person's earlier credit difficulties. Creditors obviously have a right to know if a person has had trouble in paying his bills. At the same time it can be unfair to burden a consumer for life with a bad credit record if he has improved his performance. The Associated Credit Bureaus has recognized this problem and had proposed voluntary guidelines to its members to the effect that adverse information not be reported if it is older than 7 years or 14 years in the case of bankruptcies. Nonetheless, these guidelines are not necessarily followed by reporting agencies who are not members of the ACB.

### Section-By-Section Summary

*Section 601.—Short Title.*—This section indicates that the act may be cited as the "Fair Credit Reporting Act."

*Section 602.—Statement of Purpose.*—This section indicates a need to establish safeguards for the reporting of information on consumers so as to assure its confidentiality, accuracy, relevancy, and proper utilization.

*Section 603.—Definitions and Rules of Construction.*—A "consumer report" is defined under subsection (d) as a report on an individual when the information has been collected or is to be used for credit, insurance, or employment purposes. The term does not include information reported by a creditor or other person when the information is confined to the creditor's own transactions or experience with the consumer. However, if the creditor obtains information on a consumer

S. Rept. 91–517

EXHIBIT 6

in the House on the conference report shows that some of us felt right along that the omission of regulation-issuing authority would eventually be recognized as a serious deficiency in the legislation.

**EMPHASIZES NEED FOR REGULATORY AUTHORITY GUIDELINES**

In the absence of regulations which would have the effect of law, the guidelines just issued by the Federal Reserve on behalf of all of the regulatory agencies having supervision over Government-insured or regulated financial institutions subject to the Fair Credit Reporting Act should clarify any of the problem situations likely to arise for them under the law. As the guidelines point out, banks or other financial institutions could conceivably find themselves in the position of being regarded as consumer reporting agencies under some circumstances—that is, where they act in the capacity of credit bureaus and pass along to others information obtained from outside sources, but not in case they relay to FHA and VA the credit reports which the FHA and VA require as part of an application for an insured or guaranteed mortgage.

Under unanimous consent, therefore, I submit as part of my remarks the announcement today from the Federal Reserve Board and, following that, the newspaper article referred to in my remarks:

**FEDERAL RESERVE PRESS RELEASE**

**MAY 24, 1971.**

The Board of Governors of the Federal Reserve System today issued a series of questions and answers to assist financial institutions in complying with the Fair Credit Reporting Act (a portion of Public Law 91-508). The general purpose of the Act, which became effective on April 25, is to assure fair and accurate reporting of information regarding consumers.

The questions and answers were prepared jointly by the staffs of the Board, the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Federal Home Loan Bank Board, each of which will issue them to institutions under their supervision. The information is not a regulation of the Board, and is merely designed to provide guidance to financial institutions. Institutions that act in accordance with the information, however, will be regarded by the Board's examiners as acting in compliance with the Act.

A copy of the questions and answers is attached along with the text of the Fair Credit Reporting Act.

**FINANCIAL INSTITUTIONS AND THE FAIR CREDIT REPORTING ACT**

An April 25, 1971, the Fair Credit Reporting Act became effective (Public Law 91-508, Title VI of the Consumer Credit Protection Act). It is designed to insure fair and accurate reporting of information regarding consumers. It restricts the use of reports on consumers, and in certain situations requires the deletion of obsolete information. It requires notice to consumers when the use of a credit report contributes to the denial or increase in the cost of credit or insurance, or denial of employment. Disclosures must also be made when credit is denied or the cost is increased on the basis of other information from third parties, and when investigative consumer reports are used. Under the Act consumers are entitled to disclosure of the information maintained in their files by consumer reporting agencies, and procedures are provided for the correction of erroneous information. The collection, use, and referral of information on consumers for credit, insurance, employment and other purposes by financial institutions is directly affected by this Act.

Financial institutions are likely to be subject to the Act as credit grantors, purchasers of dealer paper, issuers of credit cards, and employers. In some instances, a financial institution may even be a consumer reporting agency under the Act as a result of the type of information about consumers that it provides to others. In general, the Act does not apply to commercial transactions.

This pamphlet contains the text of the Act and questions and answers explaining the Act's applicability to the operations of a financial institution. It has been prepared to inform financial institution examiners of the principal statutory requirements of the Act, and to serve as a guide for its enforcement. The pamphlet is not designed to answer all questions that might arise under the Act; rather, it is to assist financial institutions in developing a working knowledge of the Act and its requirements. The questions and answers are being distributed jointly by the Federal Reserve Board, Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation and Federal Home Loan Bank Board, and are applicable to the operations of financial institutions subject to the enforcement authority of these agencies.

The statute is unclear in some instances as to its application to financial institutions. Court decisions may ultimately construe provision of the statute in ways contrary to the information in this pamphlet. Although copies of the pamphlet are being made available to financial institutions, the information in the pamphlet should not be relied upon without advice of counsel. Nevertheless, institutions that act in accordance with them will be regarded by examiners as acting in compliance with the Act.

**QUESTION AND ANSWERS** [1]

*I. The financial institution as a user of consumer reports*

1. May a financial institution obtain a consumer report from a consumer reporting agency in connection with a consumer's application for an extension of credit?

Yes. Reports may be obtained for this purpose, as well as certain other legitimate business purposes. Reports (known as "consumer reports" under the statute) may also be obtained in connection with the review or collection of an account, in connection with employment, or the underwriting of insurance. § 604 (See question 25 for a list of permissible purposes.)

2. Are new procedures required to obtain a consumer report?

Yes. The financial institution must identify itself and certify to the reporting agency (called a "consumer reporting agency" under the statute) the purposes for which the information is sought. It must also certify that the information will be used for no other purpose. § 607.

3. Must certification be given each time a consumer report is requested?

No. A written blanket certification by the financial institution could cover all inquiries to a particular consumer reporting agency.

4. Does a financial institution which uses a consumer report have any new responsibilities to the consumer?

Yes. If a financial institution denies employment or if it denies credit or insurance for personal, family, or household purposes, or if it increases the cost, even partially because of information in a consumer report *from a consumer reporting agency*, it must make disclosures to the consumer. It must advise him orally or in writing that information in the report caused or contributed to the denial or increase in cost, and inform him of the name and address of the consumer reporting agency issuing the report. The financial institution is not required to disclose the nature of the information in the report. § 615(a) (See question 56 which deals with the denial of employment based on a consumer report.)

5. What would constitute a "denial" of credit?

If any condition is imposed, without which credit would not be extended, and it is imposed because of information in the consumer report, there is a "denial" which would require disclosures. This would include cases where a larger downpayment, a shorter maturity, a co-signer, guarantor, or additional collateral is required as a condition of extending credit. If a consumer applies, for example, for a credit limit of $1,500, and only $1,000 is approved because of information in a consumer report, a "denial" has occurred.

6. Does a financial institution have any responsibility to the consumer when it obtains information from someone other than a consumer reporting agency?

Yes. Disclosures must be made when credit for personal, family, or household purposes is denied or the charge is increased even partially because of information obtained from someone other than a consumer reporting agency bearing upon the consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living. Disclosure would not be required if the denial is based on the financial institution's own experience with the consumer, on his credit application, or on the institution's own credit policies. Where disclosures are required they must be made regardless of whether the information is obtained currently, or is already in the files. At the time credit is denied or the charge increased, the financial institution must inform the consumer orally or in writing of his right to make a written request for disclosure of the "nature" of the information. If the consumer requests this information within 60 days, the financial institution must tell him the nature of the information orally or in writing. Note that these requirements apply only in the case of credit, and not in the case of insurance or employment where disclosures are required when a report from a consumer reporting agency is involved. § 615(b) (See question 4.)

7. What would the "nature" of the information include?

It would include information that the consumer's credit history with another financial institution is poor, his income is not what he represented it to be, he has not been employed or has not lived at the address indicated on the application for the period specified, that his debts are greater than represented, that a statement that his debts are current is inaccurate, and so on. The nature of the information should be given with enough detail to enable the consumer to question the accuracy of the information if he believes it is erroneous.

8. In disclosing the "nature" of the information, must the source be disclosed?

Although the statute does not require that the source be disclosed, it may be impossible to identify the "nature" of certain information without also revealing the source.

9. Do the requirements of disclosure by a user of information discussed in question 4 through 8 apply in the case of information about a co-maker, guarantor, or surety?

Yes. In these instances disclosures, as indicated above, should be made to the co-maker, guarantor or surety to whom the information relates.

10. Are these rules applicable when a fi-

---

[1] Answers should be read in the context of the surrounding questions and answers, which, in many cases, are structured to relate to each other.

# EXHIBIT 7

allowable charge for the following calendar year. As of January 1, 2011, the maximum allowable charge is $11.00.

## Section 613 – Public Record Information for Employment Purposes

15 USC 1681k

**Section 613(a)** provides that a CRA, when it compiles and provides public record information that is likely to have an adverse effect on a consumer's ability to obtain employment, shall either (1) notify the consumer at the time such information is provided to an employer or potential employer or (2) maintain strict procedures to insure that the information is complete and up to date. It further provides that "items of public record relating to arrests, indictments, convictions, suits, tax liens, and outstanding judgments shall be considered up to date if the current public record status of the item at the time of the report is reported." **Section 613(b)** provides an exemption to a federal agency or department when the head of the agency or department (or an appropriate delegate) makes certain written findings.

1.   RELATION TO OTHER SECTIONS

A CRA that furnishes public record information must also follow reasonable procedures to assure maximum possible accuracy of that information as required by section 607(b), even if it chooses to comply with this section by providing the subsection (a)(1) notice when providing public record information to employers.[263] An employer using the information must comply with the notice, consent, and disclosure provisions of section 604(b).[264]

2.   GENERAL

A CRA that furnishes public record information for employment purposes must comply with either subsection (a)(1) or (a)(2), but need not comply with both.[265] CRAs that provide reports for employment purposes must comply with this section, even if they are merely resellers of consumer reports obtained from other CRAs.[266] The procedures required by this section cannot be waived by the consumer to whom the report relates.[267]

3.   METHOD OF PROVIDING NOTICE UNDER SUBSECTION (a)(1)

A CRA may use first class mail or other reasonable means to notify consumers that it is providing public record information for employment purposes under subsection (a)(1).[268]

4.   STRICT PROCEDURES UNDER SUBSECTION (a)(2)

A.   Stored public information. A CRA that furnishes consumer reports for employment purposes based on previously acquired public record information (purchased periodically from a third party) must verify that any such information is complete and up to date, in order to comply with subsection (a)(2).[269]

B.   Only reported "items" must be complete and up-to-date. This section requires that each "item of [public record] information" reported be complete and up to date. For example, if the CRA reports an indictment, it must also report any dismissal or acquittal available on the public record as of the date of the report. Similarly, if the CRA reports a conviction, it must

81

report a reversal that has occurred on appeal. In some cases, often at an employer's request, a report may deliberately omit data such as arrest or probation data. Although the report is not a "complete" reflection of every single piece of public record information, because the requirement to report complete and up-to-date information is item-specific, the CRA complies if its report includes the current, complete, and up-to-date public record status of each individual item reported.[270]

## Section 614 – Restrictions on Investigative Consumer Reports

15 USC 1681*l*

Section 614 provides, "Whenever a consumer reporting agency prepares an investigative consumer report, no adverse information in the consumer report (other than information which is a matter of public record) may be included in a subsequent consumer report unless such adverse information has been verified in the process of making such subsequent consumer report, or the adverse information was received within the three-month period preceding the date the subsequent report is furnished."

## Section 615 – Requirements on Users of Consumer Reports

15 USC 1681m

**Section 615(a)** provides that any party who "takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" shall provide to the consumer orally, in writing, or electronically: notice of the adverse action; the name, address, and telephone number of the CRA (toll-free telephone number, in the case of a nationwide CRA); a statement that the CRA "did not make the decision to take the adverse action" and is unable to provide specific reasons for the action; and notice of the consumer's right to obtain a free file disclosure from the CRA, and to dispute with a CRA the accuracy or completeness of any information in a consumer report furnished by the CRA. Effective July 21, 2011, the party taking the adverse action must also disclose any numerical credit score that contributed to the adverse action, along with certain related information.

1. RELATION TO OTHER SECTIONS AND REGULATION B

   A. <u>FCRA – employment</u>. An employer who uses consumer reports to make employment decisions must make the adverse action disclosures required by both section 604(b) and section 615(a), even though there is some duplication of the disclosures required by those two subsections in the employment context.[271] Because the section 604(b)(3) notice must be provided to consumers before adverse action is taken, and the section 615(a)(2) notice must be provided after adverse action is taken, they may not be included in the same document.[272]

   B. <u>FCRA – risk-based pricing</u>. Section 615(h) generally requires creditors, in those cases that are not "adverse action" but involve extensions of credit on terms materially less favorable than

82